## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES MUNSON, Appellant.

*Opinion filed January 25, 1996.—Rehearing denied April 1, 1996.*

166

HARRISON, J., took no part.

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Jim Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee G. Goldfarb, Sally L. Dilgart and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, James Munson, was convicted of first degree murder, aggravated kidnapping, armed robbery and arson of property of Marvin Cheeks. (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a), 10—2(a)(5), 18—2(a), 20—1(a).) Following a bifurcated sentencing hearing, the trial court sentenced defendant to death on the first degree murder conviction. Defendant was additionally sentenced to concurrent prison terms of 30 years for armed robbery, 15 years for aggravated kidnapping, and 5 years for arson.

Post-trial motions for a new trial and for a new sentencing hearing were denied. Defendant's appeal lies directly to this court. (See Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rules 603, 609(a).) After careful consideration, we now affirm defendant's convictions and sentences.

## BACKGROUND

The following evidence was adduced at trial. Paramedic Kerry Pakucko testified that on the morning of October 5, 1991, at about 4 a.m., she and her partner, John Florone, were returning to the firehouse when they noticed smoke northwest of their location. As they headed toward the smoke, they came upon a car totally engulfed in fire. The area was very isolated, lonely and desolate. Because the streets in the area had no signage, it was difficult for the paramedics to identify their location. While attempting to do so, they noticed the body of a man lying face down in some water under a viaduct.

There was a bullet hole in the man's back and coagulated blood by his mouth. The paramedics determined that the man was dead. Pakucko eventually hailed a passing police squad car while Florone called to have a fire engine dispatched to the scene.

Police Officer Wade Spencer testified that he was "flagged down" by paramedics on Kostner Avenue near Van Buren Street. After speaking with the paramedics, Spencer and his partner, Larry Stubbs, proceeded west on Van Buren where they discovered a body lying in the street. There was a bullet hole in the victim's lower back area and one in his head. The officers found no identification on the victim.

Further down the street, about 200 feet to the west of the body on the other side of the viaduct, the officers observed a vehicle engulfed in flames. The license plate on the vehicle was burned. The communication operations section of the police department later identified the vehicle as being registered to Marvin Cheeks.

Detective Clifford Pilgrim, a certified fire investigator, testified that he investigated the origin of the fire which burned Cheeks' vehicle. Based upon his investigation, the fire had been started with an accelerant. Pilgrim concluded that the cause of the fire was arson.

Officer Lawrence Krause, a crime scene technician, testified that he recovered a copper bullet jacket from the floor of the interior of the burned vehicle on the passenger's side. Outside, in the area around the vehicle, Krause found a small "Bic" cigarette lighter and a burned plastic beverage bottle with a partially burned rag wick inserted in its neck.

Kenny Curry testified as follows. On October 6, 1991, the day after the murder, he was working on his car at the home of his friend, Kenny Burks. Defendant came over to Burks' home and began conversing with Burks. Burks went into the house to clean up, leaving defendant and Curry alone outside.

Curry noticed that defendant's face had burn marks and was covered with grease. Defendant told Curry that his "thing [was] taking [people] out of their cars." Defendant elaborated, telling Curry that on the prior evening he set fire to an Amigo truck because "the guy tried [him.]" He shot the man once and then shot him a second time after the man "broke and ran" away from him. Defendant then purchased some gasoline and returned to the area to burn the victim's truck. In the process of burning the truck, defendant's face was burned.

Curry further testified that he later learned that defendant's victim was Marvin Cheeks, the brother of Maurice Cheeks, a professional basketball player. Although Curry did not know Marvin Cheeks, he and a friend attended the funeral in anticipation of Maurice Cheeks' presence there. Curry did not, however, report to the police what defendant had told him about the killing.

Detectives Mike Miller and James Hanrahan were assigned to investigate the Cheeks murder. Hanrahan testified that on October 8, 1991, he received a telephone call from a member of the Cheeks family. He and Miller subsequently met with the Cheeks family member, Kenneth Burks and Ricky Vivurette. After speaking with those individuals, Hanrahan and Miller made arrangements to conduct a mobile surveillance of Burks' car.

Miller and Hanrahan followed Burks, with whom Vivurette was riding, for a period of time. Burks eventually parked on West Monroe Street. A person, later identified as defendant, approached Burks' car and began to talk to Burks. After a brief conversation, defendant turned and ran into the building at 2020 West Monroe Street and Burks drove off.

Hanrahan and Miller stopped Burks, at which time Burks explained that defendant had seen the detectives

parked nearby and believed them to be vice detectives. Defendant told Burks to drive away and to come back.

The surveillance continued. Burks drove off, returned to 2020 West Monroe Street and parked. The detectives observed as defendant ran out of the 2020 West Monroe Street building and entered the rear of Burks' car. Burks then drove off with both defendant and Vivurette.

The detectives followed, eventually stopping Burks' car at North Leavitt Street. Hanrahan first ordered Burks and Vivurette out of the car and then defendant. While Hanrahan searched defendant, Miller searched the back seat of the car, where he found a weapon. At that time, Hanrahan handcuffed defendant and advised him of his *Miranda* warnings. Miller drove the vehicle to a police garage and Hanrahan transported defendant to Area 4 Violent Crimes.

Once at the Area 4 station, Hanrahan placed defendant in an interrogation room. In the interim, he interviewed Burks, Vivurette and Curry. At about 2 a.m., Hanrahan and Miller entered the interrogation room to speak with defendant. Miller advised defendant of his rights and informed him that he had been picked up as part of their investigation of the death of Marvin Cheeks.

Defendant denied knowing Marvin Cheeks and denied any knowledge of the crimes committed against Cheeks. Defendant claimed that his face was burned when someone, attempting to rob him, pointed an aerosol can at his face and ignited it. Defendant continued in his denial until the detectives brought Burks into the interrogation room. After Burks detailed what he knew and had already told police about the crimes, defendant agreed to tell the detectives what had happened.

According to Hanrahan, defendant told the interrogating detectives the following. On the evening of

October 4, 1991, defendant was in the area of Kolmar and Van Buren Streets in Chicago. He saw a prostitute leaving Cheeks' parked car. Defendant approached the car with his gun drawn. Cheeks was asleep inside. Defendant got into the back seat of the vehicle and took $50 from Cheeks' back pocket. Cheeks told defendant that he was a fireman and a graduate of Malcolm X College.

Defendant ordered Cheeks to drive west on Van Buren Street. After traveling about 10 feet, defendant ordered Cheeks to stop the car. Cheeks then attempted to grab the gun from defendant. The gun discharged, shooting Cheeks.

Hanrahan further testified that he asked defendant whether defendant wanted Hanrahan to believe that the shooting was an accident. Defendant allegedly replied, "If you think this is an accident, how do I explain shooting him the second time and torching his car[?]"

Defendant repeated essentially the same version of these facts to Assistant State's Attorney Peter Fisher. He added that the revolver which police officers had seized from the back seat of Burks' car was the gun defendant had used to shoot Cheeks.

Detective Gene Harris and Assistant State's Attorney Charles Burnes also testified concerning statements made to them by defendant. Defendant stated to them that his prior statement concerning a prostitute had not been true. According to Harris, defendant told them that he and a friend had staked out some public telephones at 47th and Woodlawn Streets waiting for someone to rob. A black jeep-like vehicle pulled up to the telephones. A black man got out and used the telephone. Defendant told his friend that the black man was whom they were going to rob. At the time, defendant was armed with a Colt Python .357 Magnum.

Defendant and his friend approached the vehicle. The man appeared to have fallen asleep. Defendant "put the gun on the man" and told him to move over to the passenger's side of the vehicle. Defendant got in the driver's side while his friend entered the back seat. They took the man's coat, gold chain, watch and cash.

Eventually, defendant, his friend, and Cheeks switched seats. Cheeks ended up back in the driver's seat with defendant in the back seat. While defendant held the gun on Cheeks, defendant's companion instructed Cheeks to drive west on the Eisenhower Expressway. Because the vehicle was low on gasoline, Cheeks exited the expressway at Ashland Avenue for a gasoline station. Defendant's friend pumped the gasoline.

Cheeks told defendant his name and that he was a fireman. Defendant stated that at this point, he wanted to get away, but he was afraid that Cheeks would report the incident to the police. After purchasing the gas, defendant's companion ordered Cheeks to continue driving west on the expressway.

Cheeks continued on the Eisenhower, exited north onto Kostner Avenue, and ultimately proceeded west on Van Buren Street. After passing under a viaduct, defendant's friend told Cheeks to pull into a vacant lot. Cheeks panicked and attempted to grab the gun. The gun discharged twice, defendant jumped into the front passenger seat, accidently releasing the victim's safety belt, and the victim jumped from the vehicle and ran.

Defendant stated that he did not chase Cheeks; he and his companion started, instead, to walk away. Defendant then realized that he might have left fingerprints inside the vehicle by which he could be identified. Defendant then told his companion that they had to destroy the vehicle. The two purchased gasoline, poured it on the dashboard of the truck and tried, unsuccessfully,

to ignite it with a cigarette lighter. On the second attempt, there was an explosion that burned defendant's face.

On October 8, 1991, Jim Sanders, an evidence technician assigned to the Chicago police department mobile crime lab, examined Burks' car at the police garage. He inventoried the weapon found in Burks' car and transported it the crime lab. At the time of its recovery, the gun was loaded with five rounds of .38-caliber ammunition.

Robert Smith, a firearms examiner with the Chicago police department, identified the gun seized from Burks' car as a .357 Magnum Colt revolver. He testified that that particular gun was capable of firing .38-caliber bullets. Smith also examined the fired .38-caliber copper bullet jacket which had been recovered from Cheeks' vehicle. He was not able to form an opinion that the jacket was fired from a particular firearm. In his opinion, however, the jacket could have been fired from the Colt revolver.

Officer Stanley Mocaldo, a latent fingerprint examiner, testified that he identified four prints from the gun which were consistent with defendant's fingerprints. Other prints on the revolver, however, were not suitable for comparison.

Dr. Edmund Donoghue, a forensic pathologist, testified that an autopsy of Cheeks' body revealed 22 "evidences of injury," four of which were gunshot wounds. The trajectory of one bullet suggested that Cheeks might have been shot as he lay on the ground. There were scrapes, abrasions and bruises on various parts of Cheeks' body. In addition, the autopsy revealed that Cheeks was intoxicated at the time of his death. In Donoghue's opinion, death resulted from multiple gunshot wounds.

Defendant was convicted of first degree murder, ag-

gravated kidnapping, armed robbery and arson. Defendant waived jury sentencing. Following presentation of evidence and argument, the trial court determined that defendant was eligible for the death penalty based upon the presence of one statutory aggravating factor, murder in the course of an armed robbery. (See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6).) Finding "no mitigation evidence," the court sentenced defendant to death. Evidence offered at sentencing, as it relates to sentencing issues raised in this appeal, is set out below.

## JURY SELECTION

Defendant first asserts that the State's violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, denied him equal protection of the law. He contends that reasons given by the prosecution for its use of peremptory challenges in excluding two black venire members were merely pretexts for purposeful racial discrimination.

*Batson* provides a three-step process for the evaluation of racial discrimination claims in jury selection. The objecting defendant must first make a *prima facie* showing that the prosecutor has exercised peremptory challenges on the basis of race. If the defendant satisfies that initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. Third, and finally, the trial court must determine whether the defendant has met his burden of proving purposeful discrimination. *Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *Hernandez v. New York* (1991), 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.

A race-neutral explanation is one based upon something other than the race of the juror. In assessing an explanation, the focus of the court's inquiry is on the *facial* validity of the prosecutor's explanation. (*Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at

1866.) There is no requirement that the explanation be persuasive, or even plausible. A " 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection." (*Purkett v. Elem* (1995), 514 U.S. 765, 769, 131 L. Ed. 2d 834, 840, 115 S. Ct. 1769, 1771 (*per curiam*).) Absent an inherent discriminatory. intent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

Finally, the trial court's finding with respect to discriminatory intent is a matter of fact, turning largely on questions of credibility. Therefore, on review the court's findings are afforded great deference. (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) Unless the court's finding is clearly erroneous, reversal is not required. *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871; *People v. Hope* (1995), 168 Ill. 2d 1, 23.

Here, at the close of jury selection, defense counsel moved for a mistrial. In support, counsel argued that the prosecution had improperly used three of four peremptory challenges to exclude black venire members— Robert Canady, Ola Love and Sandy McElwee.

The trial court found a *prima facie* case of racial discrimination as to the exclusion of Canady and Love and, therefore, requested that the prosecution state its reasons for the exclusions. No similar finding was made with respect to venire member McElwee, and defendant asserts no error in that regard. The State urges, "simply for preservation of the issue," that the trial court's finding that defendant had made a *prima facie* case was against the manifest weight of the evidence. We consider whether the trial court's subsequent finding that the State articulated race-neutral reasons for the exclusion of Canady and Love was proper.

### Venire Member Canady

The record reveals the following statements offered by Assistant State's Attorney Rodi for the exclusion of venire member Canady. When Rodi entered the courtroom and heard the judge say Canady's name (pronounced Candy), with that unique spelling, she personally felt that she had met Canady before. Although she could not place him in the court system, she did not believe that she had encountered him in her private life. She stated that if she "could have put [her] finger on the case," she would have excused Canady for cause. Rodi did not know whether Canady had been involved previously in a case as a friend of a family member, a defendant, a victim or a witness, but she was convinced that she had known or met him before. She stated that the more Canady sat there and spoke, the stronger her convictions were that she had met him previously. Rodi also pointed to the fact that Canady hesitated when asked if he could sign a guilty verdict.

Rodi summarized that she could have met Canady over a variety of causes, not all of them friendly to the State. That, she stated, combined with Canady's hesitation concerning signing a guilty verdict, was the basis for the exclusion of him.

Defendant argues that the trial court erred in accepting Rodi's explanation as race neutral. He maintains that Rodi's "fuzzy recollection" of an encounter with Canady in some unspecified context, at an unspecified time, and at an unspecified place simply does not satisfy *Batson*'s clear and specific requirement. He complains that Rodi exercised only an intuitive judgment or suspicion in excluding Canady. Defendant contends that Rodi's lack of information along with her failure to tender supplemental questions, the answers to which might have allayed her concerns, were no more than pretexts for racial discrimination.

True, for purposes of meeting a *Batson* challenge, a

prosecutor's explanation of the use of a peremptory challenge must be clear and legitimate. However, such explanation need not rise to the level that justifies a challenge for cause. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral. *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866.

The fact that Rodi could not recall the exact circumstances of her previous encounter with Canady did not render her explanation inherently discriminatory. Absent discriminatory purpose, the exclusion of prospective juror Canady amounted to no more than a valid exercise of a peremptory challenge. " 'While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable.' " (Emphasis omitted.) *Batson*, 476 U.S. at 135, 90 L. Ed. 2d at 113, 106 S. Ct. at 1743 (Rehnquist, C.J., dissenting), quoting *Swain v. Alabama* (1965), 380 U.S. 202, 220, 13 L. Ed. 2d 759, 772, 85 S. Ct. 824, 836. See also *People v. Aguirre* (1993), 242 Ill. App. 3d 469 (peremptory challenge upheld where the prosecutor explained exclusion of the prospective juror resulting from belief that she had seen the venire member either as a witness or as a friend of a witness in some other case, which she believed possibly involved gang activity).

Defendant further argues that Rodi should not have been permitted to cite insufficient information as a basis for exclusion because the lack-of-information explanation has been found to be easily utilized as a pretext for discriminatory challenges. He maintains that Rodi had no information, other than the prospective juror's race, on which to base her challenge.

There is absolutely no requirement that a court

reject a prosecutor's explanation simply because it rests in part on a lack of knowledge. (*People v. Harris* (1994), 164 Ill. 2d 322, 333.) Rodi recalled that she had had a previous encounter with Canady. Unable to recall the specifics of that encounter, she was unwilling to risk his participation on the jury. Although this court has stated that an explanation based on a lack of knowledge deserves close scrutiny (see *People v. Harris* (1989), 129 Ill. 2d 123, 188), the court did not suggest that such an explanation may never stand (see *Harris*, 164 Ill. 2d at 334). Although further inquiry might have revealed additional information to allay the prosecution's concerns, we cannot say that the failure to further inquire undermined the validity of the proffered explanation.

Furthermore, additional inquiry would not have eliminated the prosecution's second race-neutral basis for exclusion—Canady's hesitance in answering the guilty verdict question. We have, on more than one occasion, approved the exercise of peremptory challenges on the basis of an individual's courtroom conduct or demeanor. See, *e.g.*, *People v. Andrews* (1993), 155 Ill. 2d 286 (venireperson properly excluded for hesitant, cavalier and inappropriate answers during *voir dire*); *People v. Mack* (1989), 128 Ill. 2d 231 (venireperson properly excused where she hesitated in responding to questions regarding her attitude to capital punishment); *Harris*, 129 Ill. 2d 123 (exclusion of venireperson described by prosecutor as being "meek and sleepy" and who did not answer questions in a forthright manner held proper); see also *People v. Talley* (1987), 152 Ill. App. 3d 971, 987 (peremptory challenge upheld where prosecutor stated he was " 'not too happy with the [venireperson's] demeanor and how he answered the questions' "); *People v. Peters* (1986), 144 Ill. App. 3d 310 (challenge upheld where venireperson hesitated in responding to questions).

Incidentally, defendant invites our reexamination of *Andrews*, 155 Ill. 2d 286. As he reads *Andrews*, language therein could be interpreted to mean that the mention of one race-neutral explanation coupled with an inherently discriminatory explanation overcomes purposeful racial discrimination. (See *Andrews*, 155 Ill. 2d at 294.) Defendant's concern has been characterized as the dual-motivation peremptory challenge. (See *Howard v. Senkowski* (2d Cir. 1993), 986 F.2d 24.) *Senkowski* holds that a peremptory challenge based in part on racial motivation may be allowed to stand if the challenging party can prove that the challenge would have taken place despite the improper motivation. In light of our determination that both explanations offered here were race neutral, the dual-motivation analysis has no application. To the extent *Andrews* approves of such analysis, we reserve reconsideration for an appropriate case.

The court's finding with respect to the State's explanation for excusing venire member Canady was not clearly erroneous.

## Venire Member Love

The record reveals the following statements as offered by Assistant State's Attorney Gordon in explanation for the exclusion of venire member Love. When the court asked the prospective jurors to look at both the defense attorneys and the defendant and then to look at the prosecutors, venire member Love never made eye contact or even looked at the prosecution's table. Gordon stated that when a prospective juror cannot look the prosecutors in the face when asked to do so by the judge, that raises a "red flag." According to Gordon, the prosecutors "perceived [Love] as being hostile to [them]" and for that reason, Love was excluded.

The court stated that the State's explanation for the exclusion of Love was subjective. However, in evaluating the explanation, the court stated that it could use

certain factors. In that regard, the court noted that key witnesses in the case were black and that a number of persons on the jury appeared to be black. But for those facts, the court stated, the State's explanation for excluding Love would not have been adequate. The court stated that if it was wrong with respect to the number of black jurors, the defense could renew its motion for a mistrial.

Prior to commencement of trial, the jury was called to be sworn. Only 2 of the 12 jurors were black. Defendant renewed his motion for a mistrial. The State then offered an additional explanation for excusing Love. Rodi stated that Gordon had additionally pointed out that Love had answered questions incorrectly on her juror service card regarding prior service. Rodi also reiterated her perception that Love appeared hostile to the prosecution.

The court acknowledged that there were only two black jurors, but recalled that there were additional factors supporting the court's finding of no purposeful discrimination. Therefore, the court declined to alter its prior ruling.

Subsequently, during the course of the hearing in aggravation and mitigation, the court entertained defendant's motion for a new trial. In that motion, defendant again asserted his *Batson* claim.

The court responded that it was satisfied with the manner in which the *Batson* claim had been previously handled. The court then pointed out that at least half of the witnesses for the State were black and that the most compelling witnesses, who would arouse the sympathy of the jurors, were black. Additionally, the court noted that the principal investigating detective in the case, as well as the decedent's girlfriend, were black. The court stated that it could see no motive for the prosecutor to discriminate racially: "Trial tactics would be appropriate the other way."

In response to defendant's further argument, the court noted additionally that there were black persons on the jury who had not been peremptorily challenged; the State was several short of using all of its challenges. The court stated that when it saw that there were only two black jurors as opposed to the three or four it had originally anticipated, it was not significant in light of all of the other factors the court had considered.

The court further stated that now that the trial was over, having seen all of the witnesses, it was even more convinced that the State had no motive to discriminate. The court then noted that the victim was black and again that most of the witnesses, including the victim's family members, who testified were black. The court again concluded that its findings with respect to the *Batson* claim were correct.

On appeal here, defendant argues that the State's explanation for excluding Love was mere pretext. Defendant notes this court's admonition that demeanor-based explanations are subjective and must, therefore, be closely scrutinized. (See *Harris*, 129 Ill. 2d 123.) He then urges that we follow the reasoning in two sister state cases, *Wright v. State* (Fla. 1991), 586 So. 2d 1024, and *Smith v. Texas* (Tex. Ct. App. 1990), 790 S.W.2d 794.

Both *Wright* and *Smith* are cited for the proposition that where a peremptory challenge is demeanor based, there must be confirmation on the record that the court also observed that demeanor.

We have not heretofore required confirmation on the record that the trial court observed the same demeanor as did the State. (See *People v. Fryer* (1993), 247 Ill. App. 3d 1051, 1062 (rejecting defendant's argument that demeanor-based explanation requires confirmation by the court).) A person's demeanor, subjective as it is, is subject to more than one interpretation. Therefore, that the court did not observe or that the court's inter-

pretation of a prospective juror's demeanor differs from the challenger's observation would not necessarily be dispositive. While confirmation that the trial court observed the same demeanor as did the challenger would lend credence to any purported race-neutral explanation, we believe it sufficient that the court must closely examine such explanation in light of its observation and other relevant factors.

Here, the trial court was not unmindful of the need to scrutinize the State's demeanor-based explanation. In assessing that explanation, the court expressly noted the subjectivity of the State's assessment of Love. The court again stated its reliance on other factors, such as the number of peremptory challenges used by the State, as well as the race of key witnesses in the case. See *People v. Peeples* (1993), 155 Ill. 2d 422, 469.

We note additionally that the court observed the demeanor and assessed the credibility of prosecutors Rodi and Gordon. Although the court was wrong in the number of black jurors it had originally anticipated, the court was able to support its findings with other factors. We cannot say that those findings were clearly erroneous. See *Harris*, 164 Ill. 2d at 333.

Mindful of the deference to be accorded the trial court's findings, we perceive no error in the court's determination of no purposeful discrimination in the exclusion of prospective jurors Canady and Love. Defendant suffered no equal protection violation.

## TRIAL

Defendant asserts a claim of ineffective assistance of counsel at the trial stage of these proceedings. He contends that he received ineffective assistance as a result of trial counsel's failure to move to suppress testimony of Terry Merriweather, a paramedic at Cermack Health Services.

Merriweather testified that it is her job to perform

physical examinations on inmates entering the Cook County jail facility. On October 10, 1991, she conducted an examination of defendant. According to her, there had been some confusion in the receiving area about defendant's being the person who had killed Marvin Cheeks and so she asked defendant whether he was in fact the killer. Defendant responded affirmatively and also stated that after killing Cheeks, he attempted to "torch" Cheeks' vehicle and was caught in the flames. Merriweather described that when she first saw defendant his face was "extremely" burned.

On cross-examination, Merriweather stated that she completed a "bruise sheet" on defendant. On the sheet, she recorded that defendant had bruises on his face. She did not record the cause of the burns or what defendant had told her about killing Cheeks. She further testified that it was not her job to find out information which would help the police prosecute the case. However, everyone was "asking questions and everybody was kind of curious about it." She stated that she asked defendant questions to find out exactly how his face had been burned. She did not report her conversation with defendant to the police; she did, however, reveal this information to the State's Attorney in May 1992.

Defendant characterizes his encounter with Merriweather as a "custodial interrogation" requiring *Miranda* warnings. However, no such warnings were given. Merriweather's testimony concerning defendant's admissions, he maintains, violated his fifth amendment rights, and counsel's failure to recognize and to raise the alleged violation constituted ineffective assistance of counsel.

The State initially responds that defendant has waived this claim by failing to file a pretrial motion to suppress, failing to object at trial, and failing to raise the claim in his post-trial motion. Alternatively, the

State argues that defendant was not subjected to custodial interrogation for purposes of *Miranda*. Finally, the State urges that even if counsel were ineffective in failing to suppress these statements, any error was harmless.

Defendant does not dispute that the alleged fifth amendment violation was not presented or properly preserved for purposes of appellate review. However, it is this particular failing, he maintains, which now forms the basis of his ineffectiveness claim. Thus, he contends, waiver is not a bar to our consideration. We agree with defendant; the ineffectiveness claim is now properly before us.

Ineffective-assistance claims are assessed using the two-pronged test articulated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (See also *People v. Albanese* (1984), 104 Ill. 2d 504.) First, the defendant must show that counsel's performance was so deficient that counsel was not functioning as the counsel guaranteed by the sixth amendment. Secondly, the defendant must show that the deficient performance prejudiced the defense. Unless both prongs of the test are satisfied, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

An ineffective-assistance claim may, however, be disposed of on prejudice grounds alone, without an examination of whether counsel was deficient. (*Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.) To demonstrate prejudice under *Strickland*, the defendant must show that counsel's errors were so serious as to deprive him of a fair trial. The prejudice prong is satisfied where the defendant demonstrates a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been dif-

ferent. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

We need not consider the merits of defendant's fifth amendment claim. Regardless of the nature of his exchange with Merriweather, the result at trial would not have been different had her testimony been excluded. Defendant's several statements admitting commission of the offenses were properly admitted into evidence through the testimony of Detectives Hanrahan, Miller and Harris, as well as Assistant State's Attorneys Fisher and Burnes. Incidentally, counsel attempted, albeit unsuccessfully, to have these several statements suppressed. Merriweather's testimony concerning defendant's later admissions were merely cumulative; no different outcome at trial would have resulted absent her brief testimony. Thus, defendant has failed to satisfy the prejudice prong of *Strickland*.

Defendant was not denied effective assistance of counsel.

## SENTENCING

Defendant asserts several claims of error at the second, or aggravation/mitigation, phase of his sentencing hearing. Each of these claimed errors, he maintains, violates the eighth amendment as well as State law and requires that he be given a new sentencing hearing.

Under our sentencing scheme, the second phase of a death penalty hearing requires the jury or the court to weigh and balance any mitigating factors against the aggravating factors. (*People v. Turner* (1993), 156 Ill. 2d 354, 359.) If there are no mitigating factors sufficient to preclude imposition of the death penalty, the court shall sentence the defendant to death. Ill. Rev. Stat. 1991, ch. 38, par. 9—1(h).

Defendant presents two separate arguments in which he asserts that the trial court erroneously relied on nonexistent statutory aggravating factors in imposing death. We address each claimed error in turn.

After hearing evidence in aggravation and mitigation, the trial court stated that it found the existence of the statutory aggravating factor of section 9—1(b)(8), formerly section 9—1(b)(7) (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(8); Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7)). Section 9—1(b)(8) of the Criminal Code of 1961 allows for the imposition of death where it is proved that the defendant committed the murder with the intent to prevent the murdered individual from testifying in any criminal prosecution or giving material assistance to the State in any investigation or prosecution.

Defendant complains that this factor was not applicable to the facts of this case. He urges that the holdings in *People v. Brownell* (1980), 79 Ill. 2d 508, and *People v. Adams* (1985), 109 Ill. 2d 102, mandate vacatur of his sentence and remandment for a new sentencing hearing.

In *Brownell*, 79 Ill. 2d 508, the trial court found the defendant eligible for death based upon the presence of two statutory aggravating factors, the commission of other felonies (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)) and the murder of an eyewitness (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7)). Section 9—1(b)(7) provided for death where "the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(7).) The finding of section 9—1(b)(7) eligibility was based merely upon the fact that the victim, as the subject of the kidnapping and rape, could have later testified against the defendant. The trial court also considered the factor at the second phase of sentencing.

This court, in construing the factor, limited its application to those situations where, "during an investiga-

tion or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution." (*Brownell*, 79 Ill. 2d at 526.) To construe the factor otherwise, the court reasoned, would make it applicable to every prosecution for murder since every victim, obviously, is prevented from testifying against the defendant. The court concluded that the trial court weighed a factor which figured erroneously in the court's sentencing decision. Based upon the trial court's erroneous consideration of that factor, a new sentencing hearing was required. Accord *Adams*, 109 Ill. 2d 102.

The facts in *People v. Williams* (1983), 97 Ill. 2d 252, yielded a different construction of section 9—1(b)(7). In *Williams*, the jury considered section 9—1(b)(7) in finding the defendant eligible to receive death. Relying on *Brownell*'s construction of that factor, the defendant urged his entitlement to a new sentencing hearing.

On appeal, this court acknowledged *Brownell*'s construction of the factor, but found the circumstances in *Williams* "sufficiently different" to permit a different conclusion. (*Williams*, 97 Ill. 2d at 271-72.) In *Williams*, unlike *Brownell*, the evidence showed that after kidnapping and raping the victim, the defendant set her free with instructions to go directly home and not to call the police. She did not obey, however, and went to someone's house seeking help. The owner of the house telephoned police for assistance. The defendant, who had been secretly watching the victim, subsequently took her away and murdered her. The court noted that by defendant's own admission, he acted as he did because he knew his victim was going to report the crimes to the police.

This court held that under these circumstances, the jury could have found that the victim was an eyewitness. Accordingly, the court found no error in the jury's consideration of the factor.

Here, the trial court determined that defendant was eligible to receive death based on proof of a single statutory aggravating factor, murder during the commission of another felony (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(6)). At the aggravation and mitigation stage of the proceedings, the court stated its finding with respect to each of the statutory aggravating factors. Concerning section 9—1(b)(8), the court stated that it found the presence of "such an element of aggravation." In that regard, the court stated that it was convinced that the motive for "this killing *** was to protect the defendants from prosecution."

The court inferred from the evidence and sequence of events that defendant's motive for murdering was to prevent Cheeks from subsequently identifying defendant. Defendant, in his own statement to Detective Harris, stated that when Cheeks jumped from the vehicle, defendant started to walk away. However, upon realizing that he might have left fingerprints inside the vehicle, defendant told his companion that they had to destroy the vehicle. It is not such a leap to conclude that if defendant was concerned with being identified, evidence left in the vehicle was not the only means by which such identification could occur. It is additionally relevant that Cheeks received a gunshot to the head while he was lying on the ground.

Although the text of section 9—1(b)(8) differs from that of former section 9—1(b)(7), the factor remains similar in substance. We believe that *Williams* would support a finding that the section applied to this set of facts. However, even if defendant's conduct here was not that which is properly contemplated by section 9—1(b)(8), we would yet find no error. In determining whether death is an appropriate sentence, the trial court may consider statutory as well as nonstatutory aggravating factors. (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c).) Thus, even if

defendant's motive cannot be correctly characterized as a section 9—1(b)(8) aggravating factor, it is nonetheless an aggravating factor, simply nonstatutory. As long as there is evidence to support it, characterization of the motive as statutory does not negate its existence as aggravation. The dictates of *Brownell* are not offended here and vacatur is not required.

We next consider defendant's second nonexistent aggravating factor argument. At sentencing, the court considered whether the imposition of death would have any deterrent effect. Defendant maintains that as there was no evidence in the record to support the court's deterrence finding, consideration of that factor was error. Further, relying on *Williams*, 97 Ill. 2d 252, he asserts that this court has specifically held that a capital sentencer may not consider whether the death penalty is a deterrent to crime.

First, defendant misperceives *Williams*. In *Williams*, during the hearing in aggravation and mitigation, the defendant attempted to have a newspaper reporter, various clergymen, and a professor of psychiatry describe what a typical execution entailed and to give opinion testimony as to the deterrent effect of capital punishment. The testimony was barred. On appeal, this court upheld the trial court's ruling and held that arguments against the death penalty in general and not containing evidence in mitigation are inadmissible. *Williams*, 97 Ill. 2d at 300-01.

As is apparent, *Williams* created no general bar to the trial court's consideration of whether the death penalty has any deterrent effect.

Secondly, an intended goal of punishment, including capital punishment, is retribution to society and deterrence of others from committing criminal offenses. In fact, in evaluating whether death is an excessive penalty in a particular case, this court considers whether those

two functions are served. (See *Turner*, 156 Ill. 2d at 359; *People v. Leger* (1992), 149 Ill. 2d 355, 411; *People v. Johnson* (1989), 128 Ill. 2d 253, 278.) Additionally, this court has sanctioned prosecutors' arguments in urging death as a deterrent to murder. See *People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Lego* (1987), 116 Ill. 2d 323, 349; but see *People v. Holman* (1984), 103 Ill. 2d 133, 173-75 (prosecutor's lengthy general reference to scientific studies and polls in a discussion of the deterrence rationale required that defendant be granted a new sentencing hearing); *People v. Szabo* (1983), 94 Ill. 2d 327, 363-65 (prosecutor's description of statistical relationship between number of executions and number of homicides served to focus jury's attention on notion of deterrence as opposed to other factors bearing on individual defendant's character and the crime); *People v. Barrow* (1989), 133 Ill. 2d 226, 280-81 (although prosecutor's comments were not simply on the deterrent effect of the death penalty, jury's attention was not improperly diverted).

Consistent with the intended goal, the trial court here considered the deterrent effect of imposing death in this case. In that regard, the court stated that "the public should know that when there is such a crime as this, it will be treated harshly by the legal system." Deterrence being an intended goal of punishment, we find no impropriety in the court's consideration of that factor in determining the appropriateness of death.

Furthermore, it is abundantly clear from the record that in sentencing this defendant, the court was not unduly focused on the deterrence factor. (See *Barrow*, 133 Ill. 2d at 281.) The court's consideration, instead, was largely and properly of the character of the defendant and the circumstances of these particular crimes. See *Leger*, 149 Ill. 2d at 408.

Defendant next claims unfairness at sentencing

because the court found that the murder was committed in a "cold, calculated and premeditated" manner. That factor, he argues, is void for vagueness. In that regard, defendant maintains that the terms "cold, calculated and premeditated" could apply to every defendant eligible for the death penalty. Thus, this factor fails to place any inherent restraint on a capital sentencer's discretion in imposing death.

He then argues that the crux of his claim is that the "calculated and premeditated" language of section 9—1(b)(11) is merely another way of describing intent. Consideration of this factor at the second stage of the sentencing hearing gives additional aggravation to a factor already considered at the guilt phase. Because intent must be previously found as part of a defendant's conviction for first degree murder, consideration of that factor at the sentencing phase, defendant maintains, is improper.

We have already determined that the phrase "cold, calculated and premeditated" as it is used in section 9—1(b)(11) is not unconstitutionally vague. (See *People v. Johnson* (1993), 154 Ill. 2d 356, 372-73.) Further, in its proper context, that particular factor pertains to the intent to murder pursuant to a particular plan, scheme or design. It is not simply the intent to commit murder. As such, this factor is not present in every murder case. Thus, contrary to defendant's argument, the factor does place the necessary restraint on the sentencer's discretion to impose death.

Here, in finding the presence of that factor, the court did not consider defendant's intention to commit the murder, in and of itself. Rather, after considering the particular circumstances surrounding this murder, the court concluded that the murder was part of an intentional scheme. See *People v. Ward* (1992), 154 Ill. 2d 272, 340.

Further, it is significant that consideration of this factor came at the second, or weighing, phase of defendant's sentencing hearing. Aggravation and mitigation evidence is necessarily unique to the individual defendant. Thus, it is not necessarily the case that in every sentencing determination this factor will be present. Even if it were, unlike in this case there might yet be mitigation sufficient to preclude death.

Defendant summarily argues that even if this court finds the "cold, calculated and premeditated" factor not vague on its face, we must nevertheless find it unconstitutionally vague as applied in this case. We reject defendant's unsupported claim. In support of the court's finding on this factor, it noted that after taking the victim's property, defendant and his companion made the victim drive from the "far south to the mid west side, took the time to stop for gasoline and drove specifically to an isolated area," in the court's opinion for the purpose of killing the victim in a place where they would not be observed. This evidence supports the court's characterization of defendant's conduct with respect to an intentional scheme.

We conclude that the "cold, calculated and premeditated" aggravating factor is vague neither on its face nor as applied. Further, there is no possibility that the factor will be indiscriminately applied in every case. Vacatur of defendant's sentence is not required.

Defendant next charges that the court erred in considering as aggravation that he had the gun in his presence when he was apprehended by police. Defendant maintains that it was improper for the court to infer that because he had a loaded gun in his possession that he was ready to commit additional offenses. He contends that there was no evidence in the record to support such a conclusion.

In fact, defendant argues, he had the gun in his pos-

session at the behest of Burks, who, in cooperation with police, had asked defendant to bring it. He urges that his only purpose in having the gun with him was to return it to Burks, not to commit further criminal offenses.

At the hearing on defendant's post-trial motion for a new sentencing hearing, the court affirmed that it had considered possession of the gun as an aggravating factor for sentencing purposes. The court noted, however, that that was neither the only nor the paramount factor in sentencing. The court further stated that it had not received any evidence to support the conclusion that the inference it drew from the evidence presented was, in fact, wrong.

The trial court is permitted to draw reasonable inferences from the evidence introduced during trial. (*Ward*, 154 Ill. 2d at 339.) While it is conceivable that the reasons for defendant's possessing the gun are as he now asserts, it is also plausible that the facts are as the trial court inferred. Defendant put forth no evidence to support his version of the facts. The trial court's inference, based on the evidence as it was presented at trial, is not unreasonable.

Defendant next contends that he was unfairly sentenced to death because the trial court, in imposing sentence, stated that it found "no mitigation," despite the introduction of evidence consisting of defendant's good character, charitable acts, his impoverished background and turbulent family history. Defendant acknowledges that the court was free to attribute whatever weight to the mitigation evidence it deemed appropriate. However, the court was not permitted to find that there was "no mitigation" or to find that mitigation was completely negated by other facts in the record. He contends that mitigation clearly existed.

While the trial court, for sentencing purposes, may

not decline consideration of relevant and reliable evidence proffered as mitigating (see *Hitchcock v. Dugger* (1987), 481 U.S. 393, 398-99, 95 L. Ed. 2d 347, 353, 107 S. Ct. 1821, 1824; *Eddings v. Oklahoma* (1982), 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 8-9, 102 S. Ct. 869, 874-75; *Lockett v. Ohio* (1978), 438 U.S. 586, 604-05, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2964-65 (plurality opinion)), it is not constrained to find such evidence, in fact, mitigating (*People v. Maxwell* (1992), 148 Ill. 2d 116, 148). Further, consideration of evidence proffered as mitigating does not obligate the court to impose a sentence other than death. *People v. Phillips* (1989), 127 Ill. 2d 499, 535.

This is clearly not a case in which the court did not consider the evidence proffered by defendant as mitigation. In considering that evidence, however, the court found testimony concerning certain positive character traits attributed to defendant to have been contradicted by his conduct. For example, there was abundant testimony from defendant's relatives, a teacher and a past employer to the effect that defendant cared about and was concerned about his family. The court noted that in contradiction, however, defendant had no concern or compassion for other human beings.

The court noted additional factors which counterbalanced defendant's mitigation evidence. For example, although defendant admittedly came from a "dysfunctional" immediate family, the court noted that his extended family, nonetheless, provided a fair amount of nurturing to defendant. Further, although defendant's teacher testified that defendant was in "special education," she also testified that he was "mainstreamed" into regular education classes "to prepare for graduation to high school" and his former employer testified that he was a smart kid who needed guidance.

In our view, the court did no less than what is statutorily mandated—it weighed the mitigation against

the aggravation evidence. In finding "no mitigation," the court merely found that death was the appropriate penalty. (See *People v. Montgomery* (1986), 112 Ill. 2d 517, 534.) We find no impropriety. *Cf. People v. Scott* (1992), 148 Ill. 2d 479, 559-60 (where after considering mitigation, trial court found not " 'one single iota of a mitigating factor [had] been presented' " to the court); *People v. Waldron* (1965), 33 Ill. 2d 261, 263 (rejecting defendant's claim that the death sentence was excessive where there was a "complete absence of mitigating circumstances"); *People v. Eyler* (1989), 133 Ill. 2d 173, 224 (trial court found not only that there were no mitigating factors sufficient to preclude imposition of the death penalty, but that there was no mitigation at all).

Defendant next finds error in the prosecution's closing argument. He offers two comments in particular as improperly inflammatory. The first claimed improper argument is the prosecution's statement that "every piece of mitigation is in fact aggravation." The second claimed improper argument is the prosecution's statements that defendant's introduction of mitigation evidence was an attempt to avoid responsibility for the murder.

The State responds that these claimed errors, having been neither objected to nor included in defendant's post-trial motion, are waived. (See *People v. Enoch* (1988), 122 Ill. 2d 176.) Defendant acknowledges his failure to properly preserve the alleged errors for review. Because these arguments "implicate a substantial right," however, defendant urges that we may nonetheless notice them as plain error. See 134 Ill. 2d R. 615(a).

Defendant correctly notes that under our plain error rule, we may notice "[a]ny error, defect, irregularity, or variance" which affects "substantial rights even though such was not brought to the attention of the trial court." (See 134 Ill. 2d R. 615(a).) "Before plain er-

ror can be considered as a means of circumventing the general waiver rule, [however], it must be plainly apparent from the record that an error affecting substantial rights was committed." (*People v. Precup* (1978), 73 Ill. 2d 7, 17.) Even then, the plain error rule does not mandate review of all errors affecting substantial rights. (See *People v. Pickett* (1973), 54 Ill. 2d 280, 282.) As we noted in *People v. Keene* (1995), 169 Ill. 2d 1, 17, "[p]lain error exists only with respect to 'fundamental fairness': a procedural default will not preclude review of an issue involving 'substantial rights' if to honor the bar would work 'fundamental [un]fairness.' " (Quoting *People v. Hamby* (1965), 32 Ill. 2d 291, 294.) "Plain error marked by 'fundamental [un]fairness' occurs only in situations which 'reveal breakdowns in the adversary system,' as distinguished from 'typical trial mistakes.' " *Keene*, 169 Ill. 2d at 17, quoting Wangerin, *"Plain Error" and "Fundamental Fairness": Toward a Definition of Exceptions to the Rules of Procedural Default*, 29 DePaul L. Rev. 753, 778 (1980).

Defendant urges that the allegedly improper argument could explain the court's mistaken belief that there was no mitigation in this case. Thus, defendant argues, it cannot be said that the court disregarded the prosecution's improper argument.

Even conceding impropriety in the arguments, which the State does not, we do not find that the statements effected a breakdown in the adversarial system. The fact that the court found no mitigation is not necessarily proof that the State's arguments curried any favor with the court. It is clear that the trial court engaged in an independent analysis and consideration of the aggravation and mitigation evidence, even pointing to specific evidence which shaped its sentencing determination. In the absence of fundamental unfairness, there is no basis to excuse defendant's waiver of these claimed errors.

As his final challenge to the fairness of his sentencing hearing, defendant claims that the trial court weighed aggravating factors that he had no opportunity to explain or deny. Citing *Gardner v. Florida* (1977), 430 U.S. 349, 51 L. Ed. 2d 393, 97 S. Ct. 1197, he argues that a capital sentencer may not consider information that the defendant had no opportunity to explain or deny. As additional support, defendant notes that our sentencing provision confers on a capital defendant the right to a "fair opportunity to rebut any information received at the hearing." See Ill. Rev. Stat. 1991, ch. 38, par. 9—1(e).

Defendant elaborates that at sentencing, the trial court relied on two statutory aggravating factors found in the death penalty provision (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)) as well as aggravating factors found, generally, in the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2). The prosecution had not asked the court to consider these factors and defendant had no notice that the court would, in fact, consider them. Had defendant received notice of the court's intent to rely on those factors, he argues, he might have presented evidence in rebuttal, "as would have been his due process right under *Gardner*." For these reasons, defendant asks this court to vacate his sentence and remand for a new sentencing hearing.

The holding in *Gardner* is not applicable in this case. There, the trial judge recited his conclusion to sentence the defendant to death was based on the evidence, the arguments of counsel, and his review of information contained in a presentence investigation. A confidential portion of the investigation had not been disclosed to defense counsel. There was, therefore, no opportunity for the defendant to challenge the accuracy or materiality of the information. The Court held that the defendant was denied due process of law when sentence was imposed on the basis of information which he had no opportunity to deny or to explain.

There is nothing in the record before us to suggest that the court's sentencing determination was based on evidence or information about which defendant was unaware. Further, defendant was given the opportunity to present evidence in mitigation, as well as to challenge any of the State's aggravation evidence. The fact that he did not know that certain evidence would be viewed by the court as aggravation does not constitute a due process violation.

The sentencing authority is to consider "all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding." (*Barrow*, 133 Ill. 2d at 281.) Further, the sentencing body may consider any relevant aggravating factors, statutory and nonstatutory, in the process of selecting among that class of defendant who will actually be sentenced to death. (*People v. Hayes* (1990), 139 Ill. 2d 89, 150; *Turner*, 156 Ill. 2d at 367.) Of course, the fact that an aggravating circumstance is not authorized by section 9—1 does not necessarily bar a trial court from considering it when sentencing a defendant to death. *Hayes*, 139 Ill. 2d at 151; see also Ill. Rev. Stat. 1991, ch. 38, par. 9—1(c).

At sentencing, the court announced, as part of its reasoning for imposing death, that: (1) the victim had been murdered to prevent later prosecution (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(8)); (2) the murder had been committed in a cold, calculated manner as part of a scheme (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11)); (3) the defendant was of a mind to inflict more harm (nonstatutory factor); and (4) the death sentence would deter others from committing similar offenses (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(7)).

The court's sentencing considerations were proper. We know of neither a statutory nor a constitutional mandate which would require the sentencing body, at

the close of the evidence, to recite what factors it will consider in sentencing in order to permit a defendant an opportunity to rebut the same. Defendant suffered no constitutional deprivation; vacatur is not required.

After consideration of each of defendant's challenges to the fairness of his sentencing hearing, we find no error. A new sentencing hearing is not required.

### *PRO SE* POST-TRIAL MOTION

Defendant next claims error in the trial court's failure to appoint new counsel to represent him on his *pro se* ineffective assistance of counsel motion. He invites our attention to *People v. Krankel* (1984), 102 Ill. 2d 181, in support of his argument that the trial court was required to make a "preliminary investigation" of his ineffectiveness claim. In failing to do so, defendant argues, the court erred and the cause must be remanded for the appointment of new counsel and a hearing.

In *Krankel*, 102 Ill. 2d 181, the defendant's trial counsel failed to contact an alibi witness or to present an alibi defense at trial. Based upon those failings, the defendant presented a *pro se* motion alleging ineffective assistance of counsel. Upon agreement of the parties that new counsel should have been appointed to represent defendant on his motion, this court remanded the cause for a new hearing on the motion with newly appointed counsel.

This court has since held, however, that new counsel is not automatically required in every case in which a defendant files a motion challenging the performance of his trial attorney. (*People v. Nitz* (1991), 143 Ill. 2d 82, 133-35; *People v. Ramey* (1992), 152 Ill. 2d 41, 52.) If the matters asserted in the motion lack merit or pertain to trial strategy, the court may dispose of the motion without having appointed a new attorney to assist the defendant in the presentation of those claims. (*People v. Strickland* (1992), 154 Ill. 2d 489, 527.) If, on the other

hand, the defendant's claims of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue defendant's ineffective-assistance claims. *Nitz*, 143 Ill. 2d at 134-35; *People v. Williams* (1991), 147 Ill. 2d 173, 251.

After sentencing and during presentation of other post-trial motions filed on defendant's behalf, defendant handed his attorney a note which was addressed to the court. Counsel stated for the record that the import of the note was that defendant was seeking appointment of other counsel.

After he was advised of the ramifications of making a statement on the record, defendant was permitted to read his note in open court. Reading from the note, defendant advised the court that he wished the appointment of an attorney, other than the public defender, to represent him on his motion for a new trial and sentencing hearing. Defendant stated that he wished to raise *two* issues: (1) that his counsel had been ineffective and (2) "involuntary sentence jury waiver." He then argued that when a defendant asserts an ineffective-assistance claim, the court must appoint another attorney.

In first addressing defendant's ineffectiveness claim, the court noted that defendant had not given any basis to support that claim. The court stated that a mere blanket statement claiming ineffectiveness is not sufficient. The court emphasized to defense counsel that, pursuant to *Krankel*, there must be specific points to demonstrate that counsel had not performed within a reasonable range of competency. Then, regarding defendant's claim of the involuntariness of his jury waiver, the court recounted the procedure which led to the court's acceptance of the waiver. The court noted that it saw nothing to support defendant's claim of involuntariness.

The court denied defendant's motion. However, the court stated that if the law supported appointment of

new counsel based merely on an allegation, the court would change its ruling.

At a later hearing on other post-trial motions filed on defendant's behalf, defendant was again permitted to address the court on the issue of his ineffectiveness claim. Defendant read the following:

> "On 2 occasions, I have made a claim of ineffective assistance of counsel and now I'm also making one again. My intentions are to make ineffective assistance of counsel.
> \*\*\*
> My intention is to make an ineffective assistance of counsel claim on appeal, therefore I wish to make an open Court objection for the record that due to my ignorance of the law, I'm objecting to any and all errors my attorney has made during the pre-trial as well as trial. And I also wish the post trial motion open so that no issue will be waived on appeal. It is for pictures and peremptory challenges, I was told something about the peremptory challenges that I was only able to have 6 of them. When I was looked up in the law book I was able to have 14 of them and for the pictures, that was admitted as for mitigation, I would like to know is there away [sic] I can get them back or they remain and stay impounded."

After addressing defendant's concern about peremptory challenges and photographs, the court stated that it appeared that defendant had no idea about what ineffective assistance he had received. The court noted that it had nothing before it and that its position was that before the court was required to appoint new counsel, there must be some substance to the ineffectiveness claim.

As the record bears out, in his post-sentencing motion, defendant presented two separate claims, ineffective assistance and involuntary jury waiver. The court made every effort to ascertain the nature and substance of defendant's ineffectiveness claim. Defendant, however, provided neither a basis nor facts from which the court could infer a basis in support of such claim. In

light of these facts, the trial court correctly denied defendant's motion without the appointment of new counsel.

In this court, defendant characterizes his post-sentence ineffectiveness claim as having been based upon the involuntariness of his jury sentencing waiver and trial counsel's advice in that regard. To support this characterization, he points to an earlier motion, presented at the close of evidence at the guilt phase of trial, in which defendant also moved for the appointment of new counsel.

Defendant's claim that this earlier, post-guilt-phase motion was based on the voluntariness of the jury waiver is not, however, supported by the record. The record reveals that at the close of the evidence at the guilt phase of trial defendant was permitted to read a statement to the court. He there stated his desire to have his attorney terminated because of his "feelings" that the attorney might be in conspiracy with the State and his thoughts that the attorney was not doing the "best ability as an attorney" in his case. Defendant continued that his attorney had tried on several occasions to persuade him "to cop out to a life sentence," knowing that if defendant did so he would never come home again. Defendant further stated that counsel stated to him that he wanted defendant to go back to a bench sentence so that he could "cover his ass." Defendant stated that the reason he had not dismissed counsel long ago was because counsel would convince him not to, saying that he was the attorney and that he knew what he was doing. Defendant repeatedly stated his belief that counsel was working against him.

In response, the court stated that it had no evidence to support defendant's claim that trial counsel was in conspiracy with the State. The court observed trial counsel's representation to have been vigorous, enthusi-

astic and "indeed at times *** too vigorous and enthusiastic in terms of temperament." The court then explained to defendant that it was the duty of counsel to discuss with his client all of the client's options. The court concluded that if defendant misinterpreted what counsel had done in consulting with defendant, the court regretted that, but that the decision was defendant's and that defendant had made the decision. The court repeated that defendant had not supported his opinion that counsel was working in conspiracy with the State. Defendant's motion was denied.

Contrary to defendant's characterization of his post-guilt-phase ineffectiveness claim, it is clear that such claim was not based on the "involuntariness" of his jury waiver. It appears that defendant was, in the main, concerned that counsel's loyalties lay elsewhere. Thus, the substance of that earlier motion does not support defendant's claim here on appeal.

Incidentally, we note the court's persistent and careful admonishments to defendant in accepting his sentencing jury waiver. Defendant expressed his understanding of those admonishments, acknowledged that he had not been coerced in waiving jury sentencing, and was given several hours to consider his decision. Thus, even if we now accepted defendant's characterization of his post-trial ineffectiveness claim as having been based on an involuntary jury waiver claim, we would find such a claim without merit.

We conclude, therefore, that the trial court committed no error in declining appointment of new counsel to represent defendant on his *pro se* motion. Remand is not required.

### CONSTITUTIONALITY OF DEATH PENALTY

Defendant raises two challenges to the constitutionality of our death penalty statute. He first argues that the statute violates the eighth and fourteenth amend-

ments because it places a burden of proof on the defendant which precludes meaningful consideration of mitigation.

Initially, he asserts that our statute "erects a far greater barrier" to the sentencer's full consideration of mitigation evidence than do the Arizona, Pennsylvania, or California statutes which have been upheld recently by the Supreme Court. (See *Walton v. Arizona* (1990), 497 U.S. 639, 111 L. Ed. 2d 511, 110 S. Ct. 3047; *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078; *Boyde v. California* (1990), 494 U.S. 370, 108 L. Ed. 2d 316, 110 S. Ct. 1190.) Defendant argues particularly that, unlike the Arizona statute, which limits the death penalty to cases where mitigation does not outweigh aggravation or is not "sufficiently substantial to call for leniency" (Ariz. Rev. Stat. Ann. § 13—703(E) (1989)), Illinois requires the death penalty if mitigation is not "sufficient to preclude" death (Ill. Rev. Stat. 1991, ch. 38, par. 9–1(g)).

In support of this claim, defendant, relying on the definition of "preclude" found in Webster's New World Dictionary, argues that our sentencing scheme makes death simultaneously possible and impossible. Specifically, he argues, after requiring a determination that specific aggravating factors have been proven beyond a reasonable doubt, that is, a determination that death is a possible sentence, Illinois requires the sentencer to determine whether death is not a possible sentence, that is, whether it is precluded by mitigation. Because a thing cannot be simultaneously possible and impossible, he maintains, only a sentencer who refuses to follow the law will fail to sentence an eligible defendant to death.

As an initial matter, the fact that other states have enacted different forms of death penalty statutes which satisfy constitutional requirements casts no doubt on the constitutionality of this state's statute. (*People v.*

*Pasch* (1992), 152 Ill. 2d 133, 218-19.) At any rate, we have previously considered defendant's argument as it relates to the Arizona statute. Most recently in *Keene*, 169 Ill. 2d at 33-34, we noted that consideration of mitigation under our statute was, in fact, no different from what was required under Arizona's sentencing scheme. (See also *People v. Hampton* (1992), 149 Ill. 2d 71, 117.) Further, we have consistently held that our sentencing scheme does not render death simultaneously possible and impossible. See *People v. Mitchell* (1992), 152 Ill. 2d 274, 345-46; see also *People v. Palmer* (1994), 162 Ill. 2d 465, 492-93; *Hampton*, 149 Ill. 2d at 116-17.

Defendant offers nothing to compel our reconsideration of this claimed defect in our death penalty statute. We therefore adhere to our earlier findings.

Defendant's second challenge to the constitutionality of our death penalty statute is that it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. In that regard, he asserts the following deficiencies: the prosecutor's discretion to seek capital punishment, the absence of a requirement for pretrial notice that capital punishment will be sought, limited comparative proportionality review, the absence of a requirement for written findings by the sentencer, the absence of a requirement limiting evidence of aggravating circumstances to that made known to the defendant prior to trial, the absence of a burden of proof on the prosecution, phraseology which may lead the sentencer in a particular case to place the burden of proof on the defendant, and preclusion of the sentencer's consideration of the exact ranges of sentences applicable if death is not imposed.

Defendant concedes that these issues have been found previously by this court to lack merit. Nevertheless, he urges that we reconsider these "issues individually and consider whether in their totality" these

features and omissions render the statute unconstitutional.

We decline. As we have held in the past, individual portions of the death penalty which have been previously upheld as constitutional do not collectively function to make our sentencing scheme unconstitutional and arbitrary. See *Palmer*, 162 Ill. 2d 465; *People v. Whitehead* (1987), 116 Ill. 2d 425; *People v. Albanese* (1984), 102 Ill. 2d 54.

## CONCLUSION

The judgment of the circuit court of Cook County is affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 29, 1996, as the date on which the sentence of death entered in the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.