2018 IL App (1st) 160609

SIXTH DIVISION
October 12, 2018

No. 1-16-0609

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 16282 |
| | ) | |
| GREGORY REED, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Cunningham and Connors concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant-appellant, Gregory Reed, was arrested by Chicago police on suspicion of attempted murder, aggravated battery, and aggravated discharge of a firearm after an individual fired several shots at a group standing outside a nightclub on Chicago's south side. Defendant proceeded to a bench trial. After trial, the court entered a finding of guilty on 14 of the 16 charges. Defendant filed a motion for new trial, which the trial court denied. The trial court then sentenced defendant as follows: 40 years on the attempted murder counts, 30 years on the attempted murder counts (personal discharge of a firearm), 50 years on the attempted murder counts (great bodily harm/permanent disfigurement), 30 years on the aggravated battery count,

and 15 years on the aggravated discharge of a firearm counts. The trial court denied the motion to reconsider sentence.

¶ 2    Defendant raises several issues on appeal. Defendant argues (1) the evidence was insufficient to prove him guilty of attempted murder, (2) the State failed to prove one of the victims, Mark Johnson (Johnson), was present when the shooting occurred, (3) the State failed to prove another victim, Terrence West, suffered great bodily harm or permanent disfigurement, (4) the trial court failed to address his ineffective assistance of counsel claim pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), (5) the trial court improperly considered elements of his crime as aggravating factors during sentencing, (6) his sentences were excessive in light of the mitigating factors, and (7) several of his convictions must be vacated under the one-act, one-crime rule.

¶ 3    After reviewing the record and relevant case law, we find the State presented sufficient evidence to prove defendant committed the crimes for which he was convicted. We agree with defendant that a *Krankel* hearing did not occur. We find the trial court did not improperly consider elements of his crimes as aggravating factors and his sentence is not excessive. The State concedes the one-act, one-crime rule has been violated, and we therefore vacate several of defendant's convictions pursuant to this rule. We remand for a new *Krankel* hearing.

¶ 4                                        JURISDICTION

¶ 5    On February 18, 2015, the court entered guilty verdicts for attempted murder, attempted murder (personally discharging a firearm), attempted murder (great bodily harm/permanent disfigurement), aggravated battery, and aggravated discharge of a firearm. Defendant filed a motion for a new trial, which the court denied on November 23, 2015. On December 17, 2015, defendant was sentenced. Defendant filed a motion to reconsider his sentence, which the court

denied on January 12, 2016. A notice of appeal was filed February 1, 2016. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                    BACKGROUND

¶ 7     The State charged defendant-appellant, Reed, with the following crimes: attempted murder of peace officer Errol Hicks (count I), attempted murder of West while armed with a firearm (count II), attempted murder of Hicks while armed with a firearm (count III), attempted murder of Johnson while armed with a firearm (count IV), attempted murder of Terrel Henkins while armed with a firearm (count V), attempted murder of West while personally discharging a firearm (count VI), attempted murder of Hicks while personally discharging a firearm (count VII), attempted murder of Johnson while personally discharging a firearm (count VIII), attempted murder of Henkins while personally discharging a firearm (count IX), attempted murder of West causing great bodily harm (count X), attempted murder of West causing permanent disfigurement (count XI), aggravated battery for shooting West (count XII), aggravated discharge of a firearm for shooting at Hicks while Hicks engaged in his official duties as a police officer (count XIII), aggravated discharge of a firearm for shooting at Hicks (count XIV), aggravated discharge of a firearm for shooting at Johnson (count XV), and aggravated discharge of a firearm for shooting at Henkins (count XVI).

¶ 8     The charges stemmed from a September 1, 2011, shooting outside the 50 Yard Line, a club on the south side of Chicago. The State alleged that defendant shot at a group of individuals, injuring one of them, West. Defendant proceeded to a bench trial.

¶ 9    At trial, the State presented several witnesses to establish defendant as the shooter. Chicago police officer Hicks testified that in the early hours of September 1, 2011, he was at a club called the 50 Yard Line, located on 75th Street in Chicago. Hicks was not on duty and planned to meet up with Henkins, who was deejaying at the club. Hicks went inside the 50 Yard Line and stayed for approximately 45 minutes before it unexpectedly closed early. After the closing, Hicks helped Henkins carry his equipment to a car parked outside.

¶ 10    Between 2:15 a.m. and 2:20 a.m., after finishing loading the equipment, Hicks, Henkins, Terrance West, Johnson, J.R. Jackson, and "some other females" were standing around a car located on the south side of 75th Street just a "little bit west" of the club. Hicks stood in the street near the front tire on the driver's side of the car, facing northeast, with his back to the driver's side of the car. As the group stood there, Hicks heard multiple gun shots. As a Chicago police officer, Hicks recognized the sounds of gunfire. Hicks looked over his left shoulder toward the direction of the gunshots and saw defendant with a gun. Defendant stood on the same side of the street as Hicks "in the grass of the corner house on 75th and Wabash [Avenue]." Another male individual stood "a little bit behind [the shooter], to his left, by a small bush." Hicks observed the shooter in the grass with "his arm up holding a gun pointing it" in the direction of the group. Defendant continued to fire the gun as he moved closer to the group. Of the two individuals, Hicks only observed defendant with a gun.

¶ 11    Hicks "ducked down on the side of car," but he was able to "keep[ ] a visual on [the shooter]" through the car's window. He observed defendant fire his gun in the group's direction again. Stepping away from the car, Hicks announced his office by yelling "police." Defendant continued to shoot. Hicks unholstered his service weapon and shot in the direction of defendant. Defendant fired one more time before fleeing with his companion south on Wabash Avenue.

Hicks gave chase to the corner of 75th Street and Wabash Avenue. He observed the pair enter a gangway running east toward Michigan Avenue. Hicks then lost sight of the pair.

¶ 12    Hicks returned to the vehicle to check on his friends, but did not see West. West had run "down the alley of the 7400 block in between Wabash Avenue and Michigan Avenue." When Hicks saw West again, West had "blood on his hand and also on his shirt." When the first pair of active Chicago police officers arrived on the scene Hicks provided a description of the two individuals. Those officers left to search the area and eventually returned with defendant. Hicks identified the man the officers had in custody as the individual who had shot at them a short time ago. In court, Hicks again identified defendant as the shooter.

¶ 13    On cross-examination, Hicks testified he realized West was shot when he saw West in the alley. West was approximately two house lengths away from the car at that point. Hicks informed the court that he was not in uniform at the time and had nothing on his outward appearance identifying him as a police officer. Hicks testified that defendant was about one house length away when the shooting occurred. He heard one shot initially, another shot after taking cover, a third after he announced his office, and a fourth shot while shooting back. Hicks did not know if the car took any damage.

¶ 14    Henkins testified that he was deejaying at the 50 Yard Line club located at 69 East 75th Street in the early morning hours of September 1, 2011. While working, Henkins got into an altercation with some individuals who had to be escorted from the club. After being paid, Hicks assisted Henkins in carrying his DJ equipment to the car. Once the equipment was loaded into the car, the men chatted with Jackson, Johnson, and Kevin Johnson (Kevin). Henkins positioned himself in the street toward the front of the car and was facing north while the group spoke. Hicks was "right near" Henkins.

¶ 15    While standing in the street, he heard what he initially believed to be fireworks. When he looked around he noticed the others in the group ducking down. Henkins looked around some more and observed the defendant pointing a gun at him and shooting. Defendant was standing with another individual, but Henkins could not get a good look at the other individual. Henkins could see only defendant had a firearm. Henkins could see the shooter standing on the lawn of the house at the corner of 75th Street and Wabash Avenue on the same side of the street as him. Upon seeing what direction the shots were coming from, Henkins ducked behind the car. Through the windshield, Henkins could see the defendant walking closer and continuing to fire. He then heard Hicks announce his office and shoot back at defendant. He observed Hicks pursue the shooter. When presented with a picture depicting the scene, Henkins identified where he was standing relative to where he saw the shooter.

¶ 16    After the shooting, Henkins saw West in an alley across the street from the car. He heard West complain about being hot and that he had been shot. Henkins could see blood on West's back and could tell he had been shot. When police returned to the scene with defendant, Henkins identified him as the individual who had been shooting at the group. Henkins also made an in court identification of defendant as the shooter from that night.

¶ 17    On cross-examination, Henkins admitted to having two alcoholic drinks that evening, but claimed to have not finished the second one because of the altercation inside the bar. He claimed to have been about 28 feet from defendant when the shooting occurred.

¶ 18    West testified next. He was present at the 50 Yard Line club when the fight broke out. Around 2:20 a.m., he was standing on 75th Street between Wabash Avenue and Michigan Avenue. West stood near the driver's side of the car. He testified to being with Hicks, Henkins, and Kevin. Henkins was on his left side, while Hicks was at the front of the car.

¶ 19    West stated that while the group chatted in the street, he heard gunshots. He turned west toward Wabash Avenue and saw a man firing a gun. He began running across 75th Street, fell in the middle of the road, got back up, made it to the north sidewalk, fell again, and then ran into the alley. As he ran, he heard more gunshots.

¶ 20    West stayed in the alley until the gunfire subsided. Kevin and an unidentified woman went into the alley, and the woman noticed that West's shirt was bloody on the right side. West noticed that his finger was injured and thought he broke it when he fell running. Kevin drove West to St. Bernard Hospital, which eventually transferred him to Stroger Hospital. While at the hospital, he learned that he had been struck by gunfire in the pinky finger and right side. A bullet remained inside of him from the shooting.

¶ 21    Chicago police officer Charles Meadows of the fugitive apprehension unit testified that he was on duty at 2:20 a.m. on September 1, 2011 with his partner, Officer Mitchell. The officers were patrolling in the area near the 50 Yard Line as part of a follow-up investigation of an unrelated shooting that had happened earlier at the club. As the officers performed their duties, Officer Meadows heard gunshots, and the pair relocated to the 50 Yard Line.

¶ 22    When they arrived at the scene, he spoke to Hicks and learned of the recent shooting. Hicks provided a description of the shooter. He described the pair as "two males black *** [with] braids *** [and] one had on brown and one had on black." Hicks informed Officer Meadows that the offenders went up Wabash Avenue and then went eastbound towards Michigan Avenue. Based on this information, Officer Meadows went up Michigan Avenue and then went westbound on 76th Street. He came across a pair of individuals matching the suspects' description at the "mouth of the alley *** on the north side of 76th Street." Upon seeing the pair,

he exited his car, announced his office and told the men to stop. Defendant fled, while the other individual complied with the command.

¶ 23    Officer Meadows pursued the defendant, who ran eastbound on the north side of the sidewalk of 76th Street. When the chase reached Indiana Avenue, defendant "made 'a v-line' through the street, through the grass, into a gangway residence." Indiana Avenue runs north and south parallel to Michigan Avenue. He lost sight of the defendant when he ran behind a residence. He continued eastbound to an alley off Indiana Avenue. When he could not find defendant, he doubled back to Indiana Avenue.

¶ 24    Officer Meadows, now accompanied by other officers, went to the gangway at 7549 South Indiana Avenue since he had not seen defendant exit the alley. As he searched, Officer Meadows found defendant hiding inside "a city garbage can, like the big black plastic garbage cans." Defendant was "squatting inside the can." Defendant did not comply with the officer's commands to step out of the garbage can, so the officer knocked it over. Defendant came partly out but did comply with the command to place his hands on his head. Defendant repeatedly failed to comply with commands, so the officer deployed a tazer. Defendant was eventually detained and transported back to the scene. Back at the scene, Hicks and Henkins identified defendant as the shooter.

¶ 25    On cross-examination, Officer Meadows testified that he was in plainclothes and in an unmarked car. He was "[t]hree arm lengths away" when he announced his office to the pair of men he confronted. The person with defendant was identified as Darren Young. Officer Meadows conceded defendant did not have a firearm with him upon arrest.

¶ 26    Chicago police sergeant Stacey Cotter testified that on September 1, 2011, at approximately 2:20 a.m., she responded to a shooting near 75th Street and Wabash Avenue.

When she got to the scene, she spoke to Hicks and learned he was an off-duty police officer. Sergeant Cotter canvassed the alley between 75th Street and 76th Street between Wabash Avenue and Michigan Avenue. She "went up and down the alley, [and] in and out of yards." In the backyard of 7758 South Michigan Avenue, she found a gun. An evidence technician recovered it.

¶ 27 On cross-examination Sergeant Cotter testified that 7558 South Michigan Avenue is a corner house at 76th Street and Michigan Avenue. After observing the gun, she called a lieutenant and waited for a technician to recover it.

¶ 28 After the above live witnesses testified, the parties proceeded by way of stipulation. The parties stipulated that forensic investigator Ryan recovered a Walther Model 9-millimeter/.380 ACP semiautomatic handgun and an empty magazine from the rear yard of 7558 South Michigan Avenue. Ryan took wet and dry swabs of the gun. He also recovered Hicks's weapon, a Glock Model 27 .40-caliber semiautomatic handgun. He recovered eight bullet casings and one fired bullet from the scene. He administered a gunshot residue kit to defendant at 4:55 a.m. on September 1, 2011. The parties stipulated the gunshot residue kit administered to defendant showed he "may have not" discharged a firearm from either hand.

¶ 29 The parties also stipulated to the testimony of forensic scientist Michael Cox. His investigation found no latent prints suitable for comparison on the Walther handgun, its magazine, or its five live cartridges. The dry and wet swabs taken from the handgun had an insufficient amount of DNA to perform a test. Finally, it was stipulated that four of the cartridge casings recovered from the scene were fired from the Walther and four were fired from the Glock. Testing on the fired bullet was inconclusive, though it could have been fired from the

Walther. The State rested, and the defendant moved for a directed finding. After considering the State's case, the court denied defendant's motion.

¶ 30    The trial court entered a finding of guilty on 14 of the 16 counts. The trial court concluded the State had failed to prove defendant knew Hicks was a police officer and, therefore, it entered a finding of not guilty on those counts (counts I and XIII). On March 16, 2015, defendant filed a *pro se* motion claiming ineffective assistance of counsel. Defendant claimed his counsel was ineffective because (1) counsel only visited him five times over three years of litigation, (2) counsel failed to call two witnesses who were available to testify and who could have disputed the allegations at trial, (3) defendant's father had waited to be called as a witness and went to court on both dates but was never called, (4) defense counsel never talked to defendant about the witnesses who would testify for the State and the exhibits that would be presented, (5) defense counsel never discussed closing arguments or trial strategy, (6) defense counsel failed to call the forensic specialists to explain and clarify the evidence presented, and (7) defense counsel fell asleep during trial while the State examined a witness.

¶ 31    Based on the motion for ineffective assistance of counsel, the trial court allowed trial counsel to withdraw at the next court appearance. The case was continued several times until new counsel appeared. New private defense counsel filed an amended motion for a new trial. The only allegation related to defendant's ineffective assistance of counsel claim stated "[t]he defendant, GREGORY REED, was denied the effective assistance of counsel at trial." At the hearing on the motion, new defense counsel made no mention of the ineffective assistance claim. The motion was denied.

¶ 32    The trial court held a sentencing hearing on December 17, 2015. Defendant's mother and father testified in mitigation. They testified that defendant was a great father and took excellent

care of his children. They opined that he was only a few months short of completing culinary school. Both explained that the incident did not reflect defendant's character. Defense counsel also stressed the injury to West did not appear to be serious. In aggravation, the State argued defendant was a five-time convicted felon and that he had never complete probation satisfactorily. After hearing this evidence, the court found defendant's rehabilitative potential poor.

¶ 33   The court then sentenced defendant as follows: 40 years for counts II through V (attempted murder while armed with a firearm), 30 years for counts VI through IX (attempted murder personally discharging a firearm), 50 years for counts X and XI (attempted murder causing great bodily harm or permanent disfigurement), 30 years for count XII (aggravated battery) and 15 years for counts XIV through XVI (aggravated discharge of a firearm). The trial court ordered all sentences to run concurrently. On January 12, 2016, defense counsel filed a motion to reconsider defendant's sentence, which the trial court subsequently denied.

¶ 34   This timely appeal followed.

¶ 35                                    ANALYSIS

¶ 36   Defendant argues the State failed to prove him guilty on various counts. The charges brought against defendant alleged he fired a gun at West, Hicks, Henkins, and Johnson. It was further alleged that defendant fired one of the bullets that struck West, causing great bodily harm and permanent disfigurement. On appeal before this court, defendant argues the State failed to prove (1) he intended to kill the four victims, (2) Johnson was present during the shooting and therefore a victim and (3) West suffered great bodily harm and permanent disfigurement.

¶ 37   When a defendant argues the evidence was insufficient to sustain his conviction, the inquiry is whether, after viewing the evidence in the light most favorable to the State, any

rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). In reviewing the sufficiency of the evidence, the appellate court will not retry the defendant. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). It is the trier of fact's function to assess witness credibility, weigh and resolve conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000). While the trier of facts' findings regarding witness credibility are entitled to great weight, the determination is not conclusive. *Smith*, 185 Ill. 2d at 542. The fact that the fact finder accepted testimony as true does not guarantee that it was reasonable to do so. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). However, an appellate court will only reverse a conviction where no "rational tier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Smith*, 185 Ill. 2d at 541.

¶ 38    In his first sufficiency argument, defendant challenges the evidence used by the State to prove he possessed the requisite criminal intent. In order to support a conviction for attempted murder, the State must establish beyond a reasonable doubt that (1) the defendant performed an act constituting a "substantial step" toward the commission of murder and (2) the defendant possessed the criminal intent to kill the victim. *People v. Carroll*, 260 Ill. App. 3d 319, 329 (1992). Since intent is a state of mind, it is rarely proved by direct evidence. Thus, evidence of intent will often be proven by the surrounding circumstances of the event, "including the character of the assault and the nature and seriousness of the injury." *People v. Williams*, 165 Ill. 2d 51, 64 (1995). In analyzing this element, our supreme court has long held " 'every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act.' " *People v. Koshiol*, 45 Ill. 2d 573, 578 (1970) (quoting *People v. Coolidge*, 26 Ill. 2d 533, 537 (1963)).

¶ 39    Pursuant to these standards, the trial judge, sitting as the finder of fact, could reasonably conclude from the testimony and evidence presented that defendant intended to kill West, Hicks, Henkins, and Johnson. Hicks, West, and Henkins all testified they were standing on the driver's side of a car parked on 75th Street when shots were fired from just west of them. Hicks and Henkins turned and looked west to see the defendant standing on a nearby lawn with a gun pointed at them. Both men observed defendant fire in their direction again as he walked toward their position. West was struck by one of the bullets as he ran across 75th Street. After fleeing, defendant was found inside a trash container not far from the scene. The evidence technician found four shell casings near the location both Hicks and Henkins identified as where defendant stood as he shot at them. Finally, both Hicks and Henkins identified defendant at the scene and in court as the shooter.

¶ 40    Before this court, he argues that the surrounding circumstances demonstrate only an intent to scare the group because three of the four shots missed and the only injury sustained was not life threatening. In support of his position, defendant relies on *People v. Henry*, 3 Ill. App. 3d 235 (1971). In *Henry*, we reversed a conviction for attempted murder because the surrounding circumstances failed to show an intent to kill. *Id.* at 238. In *Henry*, the surrounding circumstances showed "all or some of the street lights were out." *Id.* Defendant could have rightly sensed danger given the civil unrest gripping Chicago at the time. *Id.* Defendant was an expert marksman from the military who upon being arrested claimed he was firing into the air. *Id.* at 239.

¶ 41    We reject defendant's reliance on *Henry*. Defendant's argument is based on reweighing the evidence and viewing it based on his interpretation, an action reviewing courts should not take. *People v. Collins*, 106 Ill. 2d 237, 261-62 (1985). The facts of *Henry* are readily

distinguishable from the current action. Unlike *Henry*, Chicago was not in the grip of violent civil disturbances when defendant committed this shooting on 75th Street. There is no evidence defendant is an expert marksman, so the trial court could reasonably assume the misses were a product of bad aim. In *Henry*, the arresting officer conceded the shots could have been fired into the air because he only saw flashes from the muzzle. *Henry*, 3 Ill. App. 3d at 238-39. Two witnesses in this case testified defendant fired at them. Moreover, the logical inference from West's gunshot injury is that the defendant was aiming for West, not that the injury occurred accidentally. When viewed in totality, the testimony and evidence presented could reasonably lead a trier of fact to conclude defendant intended to kill when he fired at the group.

¶ 42     Next, defendant argues the evidence was insufficient to prove victim Johnson was actually present at the scene and therefore a victim of the shooting. Johnson did not testify at the trial. During his direct testimony, Hicks stated that Johnson was one of the individuals standing with him near the car when the shooting occurred. Hicks knew Johnson from high school. Henkins also testified that Johnson was a part of the group standing near the car. West did not identify Johnson as being present, though he was not specifically asked. West did not identify Johnson, but the court found his version corroborated Hicks and Henkins's account as to location and sequence of events. While certainly not ideal, the testimony of Hicks and Henkins, when viewed in a light most favorable to the State, was sufficient to establish Johnson's presence as part of the group when the shooting occurred.

¶ 43     In his final sufficiency of the evidence claim, defendant argues the State failed to prove West suffered great bodily harm or permanent disfigurement so as to be found guilty of counts X (attempted murder, discharging a firearm causing great bodily harm) and XI (attempted murder, discharging a firearm causing permanent disfigurement). West testified that he suffered a

gunshot wound to his finger and the right side of his body. He went first to St. Bernard Hospital and then to Stroger Hospital to receive treatment. A bullet remained in the right side of his body. In finding defendant guilty on counts X and XI, the trial court stated "[h]e's still carrying one bullet and one of the bullets hit the small finger on one hand. There's permanent disfigurement and in my view great bodily harm."

¶ 44    Proof of "great bodily harm" must demonstrate an injury "of a greater and more serious nature than simple battery and centers on the injuries the victim actually received." *People v. Steele*, 2014 IL App (1st) 121452, ¶ 28. Courts have found the term "great bodily harm" is not subject to a precise definition. *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991). The threshold for the types of injuries that constitute "great bodily harm" is significantly higher than those resulting from simply battery. *In re J.A.*, 336 Ill. App. 3d 814, 817 (2003). A reviewing court should consider the injury "actually received, the evidence of the nature and extent of the victim's injury and evidence of the treatment required." *Id.* at 818. Disfigurement is defined as that which "impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen, or imperfect, or deforms in some manner." *People v. Woods*, 173 Ill. App. 3d 244, 249 (1988) (quoting Black's Law Dictionary 420 (5th ed. 1979)). Whether great bodily harm or permanent disfigurement occurred is a question of fact. *People v. Doran*, 256 Ill. App. 3d 131, 136 (1993).

¶ 45    In viewing the evidence in a light most favorable to the State, a trier of fact could reasonably find West suffered great bodily harm and permanent disfigurement from the gunshot wounds he suffered. West suffered a gunshot wound to both his right little finger and his right side. While West was initially unaware he had been shot, several people on the scene noticed West was bleeding. West was then treated at two different hospitals. As of the date of his

testimony, some four years after the incident, a bullet remained inside of him. While there are no pictures in the record, the trial court would have been able to observe the damage to West's finger.

¶ 46     The cases relied on by defendant are noticeably distinguishable as the injuries at issue in this case are significantly worse than those described in the cases utilized by defendant. In *People v. Durham*, 303 Ill. App. 3d 763, 770 (1999), the victim suffered from a gunshot injury that required no medical attention and was described as " 'like a small nick or cut.' " Similarly, in *People v. Ruiz*, 312 Ill. App. 3d 49, 63 (2000), the officer's gunshot injury "was barely visible in a photograph of his knee that was taken on the day of the incident." The officer went to a meeting before seeking medical attention. *Id.* The evidence in this matter establishes the gunshot wounds suffered by West were considerably more serious than those at issue in *Durham* and *Ruiz*.

¶ 47     Two cases relied on by defendant do not involve gunshot wounds. The case of *In re J.A.*, 336 Ill. App. 3d at 818, involved a single stab wound of unknown size resulting in no bleeding. The victim stated it felt like a " 'pinch' " and " 'it didn't really bother him.' " *Id.* The victim in *In re T.G.*, 285 Ill. App. 3d 838, 846 (1996), was stabbed three times and described the first wound as being poked with a pen or pencil and there was no evidence he felt the other two. The court found no other evidence concerning the nature or extent of the victim's injuries. *Id. J.A.* and *T.G.* are readily distinguishable in that they did not involve gunshot wounds that caused significant bleeding. Neither *J.A.* nor *T.G.* supports defendant's position.

¶ 48     Unlike the cases relied upon by defendant, the victim in this case suffered a significant gunshot wound resulting in bleeding. West was taken to two hospitals and the bullet remains in his body. These injuries are substantially worse than the scrapes and bruises that result from a

simple battery. When viewed in a light most favorable to the State, the evidence established West suffered great bodily harm and permanent disfigurement.

¶ 49   In his next issue, defendant argues the trial court failed to conduct an inquiry into his *pro se* ineffective assistance of counsel claims as required by *Krankel*, 102 Ill. 2d 181. A *Krankel* inquiry generally proceeds in two stages. In the first stage, the trial court examines the factual bases of the defendant's *pro se* claims of ineffective assistance of the trial counsel. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). If after a preliminary inquiry, the court finds the claim lacks merit or pertains to trial strategy, the court is not required to appoint new counsel and can deny defendant's claim. *Id.* at 78. If the claim does show possible neglect on behalf of trial counsel, new counsel will be appointed to represent defendant at the second stage hearing. *Id.* New counsel will then represent defendant at an adversarial hearing on the ineffective assistance claim. *People v. Munson*, 171 Ill. 2d 158, 199-200 (1996).

¶ 50   On appeal, the standard of review for *Krankel* claims varies depending on whether the trial court employed the proper procedure and whether it made a determination on the merits. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25. Our supreme court has held that if the trial court made no determination on the merits, then the standard of review is *de novo*. *Moore*, 207 Ill. 2d at 75. If a trial court reached a determination on the merits of a defendant's ineffective assistance claim, a reviewing court only reverses if the trial court's actions were manifestly erroneous. *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). There is no indication in the record that the trial court ever ruled on the merits of defendant's ineffective counsel claim; we therefore apply the *de novo* standard of review in this matter.

¶ 51   After reviewing the record, it is evident the proceedings below did not properly conform to *Krankel* procedures. The record does not demonstrate an examination of the factual bases of

defendant's *pro se* claims of ineffective assistance of counsel occurred. *Moore*, 207 Ill. 2d at 77-78. A main concern for a reviewing court is whether "an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel" took place. *Id.* at 78 (citing *People v. Johnson*, 159 Ill. 2d 97, 125 (1994)). Allowing trial counsel to withdraw and appointing new posttrial defense counsel does not satisfy *Krankel* procedure. "The law requires *** some type of inquiry into the underlying factual basis, if any, of the defendant's *pro se* posttrial claim of ineffective assistance of counsel." *Id.* at 79. Even after new counsel appeared, there is no indication in the record that any inquiry into defendant's ineffective assistance of counsel allegations occurred.

¶ 52    While new counsel did eventually appear on defendant's behalf, there is no indication he was proceeding as *Krankel* counsel. After appearing in the posttrial proceeding, new counsel filed a motion for a new trial, but it made no specific reference to defendant's ineffective assistance of counsel motion. The motion for a new trial did contain the catch-all allegation that defendant was "denied effective assistance of counsel during trial." However, without pointing to a specific action of trial counsel, this allegation, standing alone, was insufficient to prove deficient performance or prejudice. *People v. Cherry*, 2016 IL 118728, ¶ 24 (discussing *Strickland v. Washington*, 466 U.S. 668 (1984)). In *People v. Downs*, this court explained the obligations on new counsel appointed during a *Krankel* proceeding. 2017 IL App (2d) 121156-C, ¶ 49. We explained that new *Krankel* counsel must "independently evaluate the defendant's *pro se* allegations" and "present those with merit to the trial court during the second-stage adversarial hearing." *Id.* If no meritorious claims are found, *Krankel* counsel should withdraw. *Id.* ¶ 51. The record does not show new counsel took any step to fulfill this obligation.

¶ 53    Based on this record, this matter must be remanded for a new first stage *Krankel* hearing. On remand, the trial court should engage in a preliminary inquiry as required under the case law. *Moore*, 207 Ill. 2d at 79. In this way, an adequate record will be made of defendant's claims of ineffective assistance of counsel. If, after a hearing, the trial court determines the claims lack merit or pertain to trial strategy, it can deny the motion. If it is determined to have some merit, the court can proceed to a second stage adversarial hearing. If defendant is unsuccessful at either stage, he can appeal if he chooses. *Krankel*, 102 Ill. 2d at 189.

¶ 54    In his next issue, defendant argues his 50-year sentence on counts X and XI is excessive because the trial court improperly considered elements of those crimes as aggravating factors in sentencing. He also alleges the sentence is excessive in light of the mitigating factors discussed at sentencing. When the trial court imposes a sentence, it must carefully consider the nature and circumstances of the crime and the background and personal history of the defendant. *People v. Maldonado*, 240 Ill. App. 3d 470, 485 (1992). Case law firmly establishes that sentencing is a matter of judicial discretion and absent an abuse of discretion, reviewing courts will not alter it. *People v. Perruquet*, 68 Ill. 2d 149, 153 (1977). However, whether a trial court improperly considered an element of the offense as an aggravating factor in sentencing raises a question of law we review *de novo*. *People v. Chaney*, 379 Ill. App. 3d 524, 527 (2008).

¶ 55    We apply a *de novo* review to defendant's first claim of sentencing error. A sentencing court cannot rely on a factor inherent in the offense as an aggravating factor in sentencing. *People v. Conover*, 84 Ill. 2d 400, 405 (1981). In determining the correctness of a sentence, the reviewing court should not focus on a few words or statements made by the trial court but should consider the record as a whole. *People v. Bolden*, 210 Ill. App. 3d 940, 948 (1991). An isolated

remark made in passing, even though improper, does not necessarily require that defendant be resentenced. *People v. White*, 114 Ill. 2d 61, 68 (1986).

¶ 56 Defendant did not raise this sentencing issue in a posttrial motion and therefore seeks review of the issue under the plain error doctrine. In order to preserve a claim of sentencing error, defendant must raise both a contemporaneous objection and file a written postsentencing motion raising the issue. *People v. Bannister*, 232 Ill. 2d 52, 76 (2008). If a defendant fails to take the appropriate action below, an appellate court can only review the matter if defendant establishes plain error. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To establish plain error, a defendant must first show "a clear or obvious error occurred." *Id.* For a sentencing issue, defendant must then demonstrate either "(1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.*

¶ 57 Before engaging in a plain error analysis, we must first determine whether error was committed by the trial court during sentencing. Defendant takes issue with the following statement made by the trial court at sentencing:

"The sentence is absolutely necessary to deter others from committing the same crime. And, of course, some of these counts, inherent in the count, is the fact that the defendant committed an offense with a gun and great bodily harm was caused as well as permanent disfigurement. So some of these counts actually include those factors."

We disagree with defendant that the above quote demonstrates the trial court improperly relied on elements of the crimes, specifically the infliction of great bodily harm or permanent disfigurement, when it imposed the various sentences. Just prior to making the above statement,

the trial court made specific findings as to each mitigating and aggravating factors. He did not mention great bodily harm or permanent disfigurement as aggravating factors. In the first sentence of the above quoted language, the trial court is indicating that the sentence is meant to deter others from committing the same crime, *i.e.*, shooting indiscriminately into a large group of people. The trial court then acknowledges "great bodily harm" and "permanent disfigurement" are already taken into consideration as part of the crime itself.

¶ 58    In concluding the trial court did not give improper consideration to elements of the crimes as aggravating factors, we find the cases relied upon by defendant to be distinguishable. The trial court in *People v. Saldivar* specifically found as the "primary statutory factor in aggravation 'the terrible harm that was caused to the victim.' " 113 Ill. 2d 256, 264 (1986). In finding error, our supreme court faulted the trial court for focusing on the death of the victim as the primary factor in aggravation because it was implicit in the conviction. *Id.* at 272. The trial court in *People v. Martin* committed a similar sentencing error when it considered the victim's resulting death as the predominating aggravating factor in sentencing defendant to the maximum. 119 Ill. 2d 453, 461 (1988). The trial court wrote "resulting in death" on the form indicating which aggravating factors he considered in sentencing. *Id.* Unlike *Martin* and *Saldivar*, the trial court's statements in this matter reflected the fact the sentencing ranges already took into account the "great bodily harm" and "permanent disfigurement" caused by defendant's actions. The trial court's main concern appears to be discouraging individuals from shooting into large groups of people. Accordingly, we find the trial court did not improperly utilize elements of the crime as aggravating factors in sentencing. Since we find no error in the trial court's statements, we decline to engage in a plain error analysis.

¶ 59    Defendant next asks use to invoke our power under Illinois Supreme Court Rule 615(b)(4) to reduce his sentence. Under this rule, a reviewing court may "reduce the punishment imposed by the trial court." Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). While the rule grants us the power to reduce a sentence, our supreme court has cautioned us to use this power sparingly. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). As a result, we will not reduce a sentence absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). An abuse of discretion occurs in sentencing when the sentence "is greatly at variance with the purpose and spirit of the law, or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 60    Defendant argues his sentence is excessive in light of his strong family ties, his educational pursuit, and his rehabilitative potential. Before sentencing, the trial court listened and reviewed evidence in aggravation and mitigation. In mitigation, the court heard from defendant's mother and father. They testified defendant had almost completed a certificate at Le Cordon Bleu Culinary Arts School. They characterized their family as strong and close-knit. The court heard how defendant had five children and that he was active in their lives. He was described as an "excellent father." Defendant was also unemployed. In aggravation, the court heard about defendant's prior convictions. Defendant had several prior felonies including for illegal possession of firearm. Defendant had several drug convictions as well. For two of his prior convictions (both from 2004), defendant had failed to complete probation satisfactorily, though he had satisfactorily completed probation from his 2010 conviction.

¶ 61    After reviewing the mitigating and aggravating factors, the trial court concluded defendant had poor rehabilitative potential. The court concluded defendant had failed to learn from his past convictions. It also wanted to deter others from shooting into large groups of

people. The trial court sentenced defendant to 40 years on counts II through V (attempted murder). Defendant received 30 years on counts VI through IX (attempted murder, personal discharge of a firearm). He received 50 years on counts X (attempted murder causing great bodily harm) and XI (attempted murder causing permanent disfigurement). He received 30 years on count XII (aggravated battery of West) and 15 years for counts XIV through XVI (aggravated discharge of a firearm). All sentences are to run concurrently and he must serve 85% of the sentence. The sentences are within the proscribed sentencing ranges.

¶ 62     We reject defendant's assertion that the trial court failed to properly consider the mitigation evidence and decline to invoke our power under Rule 615(b)(4) to reduce defendant's sentences. Defendant reiterates the mitigation evidence presented but does not point to anything in the record showing the trial court disregarded it. "[I]f mitigating evidence is presented at the sentencing hearing, this court presumes that the trial court took that evidence into consideration, absent some contrary evidence." *People v. Shaw*, 351 Ill. App. 3d 1087, 1093 (2004). Rehabilitation and other mitigating factors are not entitled to greater weight than the seriousness of the offense (*People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001)), and we will not substitute our judgment on the weight given to factors (*People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). After reviewing defendant's sentences and the trial court's reasoning from the sentencing hearing, we cannot say the trial court abused its discretion in imposing the various sentences. We affirm each of defendant's sentences.

¶ 63     In his final issue, defendant claims violations of the one-act, one-crime principle and requests a correction to his convictions. The State agrees the one-act, one-crime principle has been violated and a correction is needed. Under the one-act, one-crime doctrine, a defendant may not be convicted of multiple offenses that are based upon the same physical act. *People v. Nunez*,

236 Ill. 2d 488, 494 (2010). If the defendant is found guilty of two or more offenses that are based upon the same physical act, then the court must vacate the less serious offense and impose a sentence on the conviction for the most serious offense. *People v. Lee*, 213 Ill. 2d 218, 226-27 (2004).

¶ 64    Defendant's situation represents an exceptional circumstance because he was sentenced to a longer sentence for a less serious crime. As it relates to Hicks, Johnson, and Henkins, the more serious offenses were counts VII, VIII, and IX (attempted murder, personally discharging a firearm), but the trial court only imposed a 30-year sentence on each of those. The trial court imposed a greater sentence (40-year term) on counts III, IV, and V (attempted murder while armed with a firearm) even though they were less serious. This mistake accrues to defendant's benefit. The State concedes counts II through VI and counts XI through XVI should be vacated under the one-act, one-crime rule. Accordingly, we order those counts vacated.

¶ 65                             CONCLUSION

¶ 66    For the foregoing reasons, we affirm defendant's convictions under counts VII, VIII, IX, and X and the sentences imposed under them. Based on a violation of the one-act, one-crime rule we order counts II through VI and counts XI through XVI vacated. We remand this proceeding for a first stage *Krankel* hearing.

¶ 67    Affirmed in part and vacated in part; cause remanded with directions.