2024 IL App (1st) 220474-U

FIFTH DIVISION
May 31, 2024

No. 1-22-0474

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 5260 |
| | ) | |
| DEMARRED EWING, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Lyle and Navarro concurred in the judgment.

## ORDER

¶ 1    *Held*:   Defendant's conviction is affirmed. After remand for a *Krankel* hearing, defendant cannot show there was a reasonable probability that he would have accepted the State's plea offer if he received effective assistance of counsel.

¶ 2    Following a jury trial, defendant Demarred (also referred to as Demarrio and Demarreio) Ewing was found guilty of attempted murder and aggravated battery with a firearm. He was sentenced on the attempted murder count to 30 years in prison. Following this court's remand for a hearing pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), the trial court denied Mr. Ewing's

motion for a new trial. On appeal, Mr. Ewing argues the trial court erred in denying his motion, as his trial counsel failed to adequately review the video evidence against him and gave him an inaccurate impression of the State's case, causing him to reject a favorable plea offer that he would have otherwise accepted. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4       Mr. Ewing was charged by indictment with five counts of attempted murder, one count of aggravated battery, and one count of aggravated unlawful restraint in connection with the shooting of Kevin Flint on February 19, 2016. The State proceeded to trial on one count each of attempted murder while armed with a firearm (720 ILCS 5/8-4(a), 720 ILCS 5/9-1(a)(1) (West 2016)) and aggravated battery with a firearm (720 ILCS 5/12-3.05(1) (West 2016)). The remaining counts were nol-prossed.

¶ 5                                    A. Plea Discussions

¶ 6       On the day of trial, the State offered Mr. Ewing a plea deal of 12 years in prison in exchange for a guilty plea on the lesser charge of aggravated battery with a firearm. Defense counsel informed the court of the plea offer. The court admonished Mr. Ewing that, if he proceeded to trial, he would be facing a minimum sentence of 21 years in prison. It also admonished him that he was under no obligation to accept the offer of 12 years on the lesser offense but, if he did not accept it, a term of 12 years would no longer be possible.

¶ 7       The court passed the case to allow Mr. Ewing time to discuss the offer with his counsel. When proceedings reconvened later that day, the parties informed the court that they were ready for trial. The State asked the court to re-admonish Mr. Ewing, which it did, informing him that he faced a minimum sentence of 26 years in prison for attempted murder with a firearm. Mr. Ewing confirmed that he understood.

¶ 8                                    B. Trial and Initial Appeal

¶ 9      At trial, Mr. Flint testified that when the shooting occurred, he had known Mr. Ewing, whom he identified in court, for over a year and knew him at that time only as "Rio." Mr. Flint occasionally worked as a mechanic. On the day before the shooting, Mr. Ewing contacted Mr. Flint, who agreed to fix a flat tire and the door of Mr. Ewing's vehicle. Mr. Flint received partial payment from Mr. Ewing.

¶ 10     The next day, Mr. Flint made plans to meet Mr. Ewing to return the keys to the vehicle. Mr. Flint had put a new tire on Mr. Ewing's vehicle but could not fix the door. Mr. Flint met Mr. Ewing and they went to a liquor store on 94th Street and Cottage Grove Avenue. After purchasing liquor, they stood on the sidewalk outside the store drinking. Mr. Flint asked Mr. Ewing for more money for the work he did on Mr. Ewing's vehicle. Mr. Ewing never really answered. Eventually, Mr. Flint started toward a bus stop about 20 feet away, then turned around, came back, and again asked Mr. Ewing for payment.

¶ 11     Mr. Ewing pulled a firearm out of his right jacket pocket and shot at Mr. Flint two or three times, hitting him in the right thigh and left side of his groin. Mr. Ewing then ran away. When the police arrived, Mr. Flint told them "Rio" had shot him. He also told the police where Mr. Ewing's vehicle was parked and that Mr. Ewing might be found going to the vehicle.

¶ 12     The State then referenced video cameras located inside and outside the liquor store. Following a sidebar, the court overruled defense counsel's objection for a lack of foundation. The State, over defense's objection, then published and submitted three videos into evidence from the liquor store's surveillance cameras, two showing the inside of the store and one showing the sidewalk outside it.

¶ 13     Mr. Flint identified himself and Mr. Ewing in the videos. In the video clip showing the

outside of the store, Mr. Flint identified where Mr. Ewing "just shot me and ran." When Mr. Flint was released from the hospital five days after the shooting, he identified Mr. Ewing in a photo array.

¶ 14    On cross-examination, Mr. Flint confirmed that he was in custody and had two pending cases being prosecuted by the State. On redirect examination, he testified that he had not been promised anything by the State to testify and no deals had been made regarding his case.

¶ 15    In closing arguments, defense counsel referenced the video depicting the shooting and argued that "[y]ou can't see anyone's face in the video." Counsel elaborated that "[y]ou can't see the shooter's face, you can't see [defendant's] face" and "[f]rom far away it's grainy and it's no way to identify the people in the video." Counsel also argued that Mr. Flint had an "elaborate story" about fixing Mr. Ewing's vehicle that "[didn't] make any sense," he was facing pending charges in a different case, and the bottom line was that "we have to take" his word for everything.

¶ 16    The jury found Mr. Ewing guilty of attempted murder and aggravated battery. The trial court merged the aggravated battery count into the attempted murder count and sentenced him to 30 years in prison.

¶ 17    Mr. Ewing appealed. On January 30, 2020, this court granted the parties' agreed motion for summary disposition and remanded the case with instructions to the trial court to conduct a *Krankel* hearing. *People v. Ewing*, 1-17-2318 (Jan, 30, 2020) (disposition order).

¶ 18                          C. Proceedings on Remand

¶ 19    On remand, Mr. Ewing filed a *pro se* motion alleging that his trial counsel provided ineffective assistance by withholding "actual video footage that the State had against" him. He asserted that his counsel had shown him two clips of the video footage, "stating that the video was only in black and white" and that it "did not show the defendant in the video." However, different

video footage was shown at trial, including multiple clips showing him clearly. Mr. Ewing asserted that his trial counsel "lied to him" by stating that there was no evidence against him because he did not appear in the video footage. Mr. Ewing stated he rejected the plea offer because he believed that the State had no incriminating evidence against him, and, had counsel shown him the actual video footage, "the case may have never proceeded to trial." The trial court appointed Mr. Ewing counsel to review the allegations and file a motion for a new trial.

¶ 20    Mr. Ewing's *Krankel* counsel filed a supplemental motion requesting a new trial. In the motion, Mr. Ewing asserted that his trial counsel showed him only a small part of the video content tendered by the State. The part he was shown was in black and white and not clear. Based on what he saw, he rejected the plea offer. However, at trial, the State introduced videos of the interior of the liquor store that were in color and clearly showed Mr. Ewing's face, which had not been shown to him. Mr. Ewing contended that, had he been shown the complete video that was shown to the jury, he would have been able to make an informed decision to take the plea offer instead of making a decision based on incomplete and distorted information.

¶ 21    Mr. Ewing alleged his trial counsel was ineffective when she failed to show him accurate and complete images from the video evidence provided by the State before he made the decision to reject the plea offer. Because of counsel's failure to adequately inform him of the evidence against him, he rejected an offer of 12 years in prison on a lesser charge and instead chose to go to trial. It would have been reasonable under the circumstances for him to take the plea, since the video evidence was fatal to his defense and the minimum sentence, if he was found guilty after trial, was greater than the 12-year offer. Mr. Ewing argued that, due to his trial counsel's ineffective representation, he received a 30-year sentence.

¶ 22    At the hearing on his motion, Mr. Ewing testified that his trial counsel showed him three

black and white video clips, about two to three minutes each, on a laptop prior to trial, and one "couldn't really make out a face in the video." Mr. Ewing never viewed them on a larger screen prior to trial. The State made the plea offer after he had viewed the videos on the laptop, and he made his decision to reject that offer based on "what [he] saw and what [he] was told" by his counsel.

¶ 23    Mr. Ewing was "under the impression to fight the case" because he was convinced that "it wasn't any definite evidence against [him]." From what he was told and saw, in his mind there was no video evidence linking him to the crime. But at trial, the video shown was longer, clearer, and in color. In that video, he "was able to see everything." Mr. Ewing would have pled guilty had he seen that video prior to trial.

¶ 24    On cross-examination, Mr. Ewing confirmed that, after he viewed the video on the laptop, his counsel informed him that Mr. Flint had identified him in a photo array as the person who shot him.  Mr. Ewing also testified on cross-examination that after he received the plea offer he asked his counsel whether, if he went to trial, he would be found guilty of the "higher" charge of attempted murder or the lesser charge of aggravated battery, given that "the victim was hit below the belt." Counsel told him that there "should be no reason that a jury would find [him] guilty" of attempted murder and, if he was found guilty of the aggravated battery, the most he would be sentenced to would be 15 years in prison. Counsel told him that the sentencing range for the aggravated battery was 6 to 30 years, but he would most likely receive a 15-year sentence. Mr. Ewing testified that his trial counsel "assured" him that if he was found guilty, the most he would get would be 15 years.

¶ 25    On redirect examination, *Krankel* counsel played portions of Defense Exhibit No. 4, part of which was the surveillance videos from outside the store, on a laptop. Mr. Ewing confirmed

that this was how he had viewed the videos he saw in the jail. Counsel played one video clip from Exhibit No. 4, identified as the footage from camera 16, and Mr. Ewing confirmed that he had viewed this video in jail, and that it was in black and white and did not depict any faces clearly.

¶ 26    On recross-examination, Mr. Ewing acknowledged that prior to rejecting the plea he had viewed at least two videos taken from inside the liquor store but testified that they were not in color and did not show a whole face. On re-redirect examination, Mr. Ewing confirmed that he chose to go to trial based on the evidence shown to him. He believed that the same evidence would be presented at trial, and that the video was one of the main pieces of evidence against him.

¶ 27    Trial counsel, Coryn Steinfeld, testified at the hearing. She testified that, while Mr. Ewing was in jail, she showed him video footage from the incident using an older laptop. She could not recall how much of the footage she showed to him. Ms Steinfeld testified that she believed that Mr. Ewing's face was more easily recognizable on the video from inside the store when viewed on the big screen at trial than when it was viewed on the laptop she had shown Mr. Ewing before trial. Counsel did not recall the video taken outside the store looking different on the big screen and believed that it was from an angle that did not show any faces. The part that "looked different" in her view was that Mr. Ewing's face was visible in the video that was shown at trial taken by the camera inside the store.

¶ 28    Ms. Steinfeld testified that she advised Mr. Ewing throughout the case and discussed with him the specifics of each piece of the State's evidence, including the videos. Mr. Ewing was present at hearings prior to trial. A larger screen was available in counsel's office, but she did not ask permission to show Mr. Ewing the video on the bigger screen prior to trial. Ms. Steinfeld herself viewed the video on a larger screen for the first time at trial.

¶ 29    On cross-examination, Ms. Steinfeld confirmed that a laptop was the only means available to show Mr. Ewing the video in jail. She had informed Mr. Ewing that the victim identified him and would be testifying at trial. Ms. Steinfeld confirmed that she knew the sentencing range for aggravated battery with a firearm was 6 to 30 years, and that the sentence could be greater if Mr. Ewing was found guilty of attempted murder. She denied telling Mr. Ewing that a jury would not find him guilty of attempted murder and that she could guarantee he would only receive 15 years in prison if found guilty on the aggravated battery charge. She told Mr. Ewing that they would ask for aggravated battery with a firearm rather than attempted murder, but she never guaranteed a 15-year sentence if he went to trial.

¶ 30    On redirect examination, Ms. Steinfeld testified that Mr. Ewing knew about the evidence against him, and she showed him all the videos she had.

¶ 31    The court examined Ms. Steinfeld, who confirmed that Mr. Ewing had been informed that he was charged with attempted murder and faced a sentencing range of 6 to 30 years if a jury found him guilty. Counsel was not positive that the trial court gave Mr. Ewing a "Curry" admonishment, but counsel had informed Mr. Ewing. Counsel confirmed that she did not guarantee that a jury would not find Mr. Ewing guilty of attempted murder. Nor did she guarantee that he would only be sentenced to 15 years in prison.

¶ 32    The two defense exhibits shown at the hearing are included in the record. Defense Exhibit No. 4, which is labeled and described as the videos that were shown to Mr. Ewing before trial, includes six videos of about 30 minutes apiece from the surveillance cameras inside and outside the liquor store. The first four videos are in color and depict various views of the interior of the liquor store. Of those, Camera 5 shows Mr. Ewing briefly for about 25 seconds walking in an aisle at the timestamp 8:20 p.m. Camera 10 shows Mr. Ewing and Mr. Flint at the register at the

timestamp 8:20:30 p.m., where they remain for approximately one minute before exiting. Camera 14 shows Mr. Ewing and Mr. Flint entering the store at timestamp 8:19:34 before they go out of frame. The last two cameras, 15 and 16, show black and white views of the street in front of the store, and the sidewalk and street to the side of the store, respectively. Camera 15 briefly shows two men at the bottom right hand edge of the screen at the timestamp 8:22 p.m., for approximately 30 seconds. However, the figures are quite blurry. Camera 16 shows two men walking up the sidewalk at timestamp 8:22, then their silhouettes are seen standing on the edge of an empty lot from a distance, dressed in dark jackets talking on the sidewalk. One figure speaks animatedly to the other, who just stands at the edge of the lot. The former person walks away at timestamp 8:28:10, then turns around ten seconds later and goes back to talk to the second person again. The second person, who is still standing at the edge of the lot, shoots the first person and then runs away through the empty lot.

¶ 33    Defense Exhibit No.5, is labeled on appeal as the videos that were shown at trial. This exhibit has also been viewed by this court. The substance of the videos is the same as those in Defense Exhibit No. 4, though edited to show only the relevant portions. One video on the disc is all six videos cut together from when Mr. Ewing and Mr. Flint entered the store through the shooting. The quality of the videos is better but, as with Exhibit 4, the videos from inside the store are much clearer and  the videos outside the store, which depict the shooting, are far away and blurry.

¶ 34    The trial court denied Mr. Ewing's motion for a new trial. The court stated that it had reviewed the court record, viewed the videos shown to the jury, and viewed the videos shown to Mr. Ewing on a laptop. The court agreed that the video was clearer on a big screen than on a laptop

in black and white. However, it found that whether the jury could identify Mr. Ewing from the video was not clear at all. Further, the evidence also included the victim's identification of Mr. Ewing and Mr. Ewing knew the victim would be testifying and identifying him, and that the victim had previously identified him in a photo array.

¶ 35 The court found the fact that the video footage was clearer on a big screen and counsel had not shown it to Mr. Ewing on a large screen was not ineffective assistance. The court found Ms. Steinfeld had shown Mr. Ewing all the evidence and discussed the case and Mr. Ewing's options.

¶ 36 The court found Mr. Ewing's testimony that Ms. Steinfeld guaranteed Mr. Ewing a specific outcome was not credible. As Mr. Ewing stated, counsel advised him that they would try to "go for" aggravated battery with a firearm instead of attempted murder, but counsel could not and did not guarantee that outcome for him. The trial court concluded that Mr. Ewing rejected the plea because he incorrectly thought the maximum sentence he would get after trial would be 15 years.

¶ 37                                   II. JURISDICTION

¶ 38 The trial court denied Mr. Ewing's motion for a new trial on March 16, 2022, and Mr. Ewing filed his notice of appeal on March 28, 2022. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 39                                   III. ANALYSIS

¶ 40 On appeal, Mr. Ewing argues that Ms. Steinfeld provided ineffective assistance by failing to adequately review the State's evidence, which resulted in him having an inaccurate impression of the strength of the State's case that caused him to reject a favorable plea that he would have

otherwise accepted.

¶ 41    Here, Mr. Ewing raised a *pro se* posttrial claim of ineffective assistance of counsel, and, following a preliminary hearing pursuant to *Krankel*, 102 Ill. 2d 181, on remand, the trial court properly appointed new counsel to represent him at the second-stage adversarial hearing on his ineffective assistance claims. See *People v. Reed*, 2018 IL App (1st) 160609, ¶ 49 (if allegations during a preliminary *Krankel* hearing demonstrate possible neglect of the case, new counsel should be appointed to represent defendant at the second-stage hearing).

¶ 42    The State contends that we may overturn the trial court here only if the decision is manifestly erroneous, citing *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). However, we agree with Mr. Ewing that this case and that standard apply to the trial court's decision to appoint new counsel for a *Krankel* hearing, which is not before us. Where, as here, there has been an evidentiary hearing on whether a criminal defendant received ineffective assistance of counsel, our standard of review depends on whether we are reviewing a determination of law or of fact. *People v. Velasco*, 2018 IL App (1st) 161683, ¶ 137. We defer to the court's findings of fact and will disturb them only if they are against the manifest weight of the evidence, but we review *de novo* the court's ultimate determination of whether counsel rendered ineffective assistance. *Id.*

¶ 43    The right to effective assistance of counsel extends to the plea bargaining process. *People v. Hale*, 2013 IL 113140, ¶ 15. A criminal defendant's claim of ineffective assistance of counsel in the plea bargaining context is evaluated under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Id.*

¶ 44    To prove a claim of ineffective assistance of counsel under *Strickland*, a defendant must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant. *Id.* A defendant must satisfy both

prongs of the *Strickland* standard to prevail on an ineffective assistance of counsel claim. *People v. Pingelton*, 2022 IL 127680, ¶ 53. We therefore may dispose of an ineffective assistance of counsel claim under the prejudice prong without addressing counsel's performance. *Hale*, 2013 IL 113140, ¶ 17. Here, we proceed directly to the prejudice prong.

¶ 45    To establish prejudice in the context of a guilty plea, a defendant must show that there is a reasonable probability that, had he received effective assistance of counsel, he would have accepted the State's plea offer, that his guilty plea would have been accepted, and that he would have ultimately received a more favorable sentence than was actually imposed. *Id.* ¶¶ 18-19. However, if the defendant cannot establish the first requirement, that there was a reasonable probability he would have accepted the State's plea offer had counsel's performance not been deficient, then we need not address the remaining factors. *Id.* ¶ 21.

¶ 46    A showing that a defendant would have accepted the plea offer must go beyond the defendant's "subjective, self-serving" testimony. *Id.* (internal quotation marks omitted). Rather, this court must also find "independent, objective confirmation that defendant's rejection of the proffered plea was based upon counsel's erroneous advice." *Id.* ¶ 18 (quoting *People v. Curry*, 178 Ill. 2d 509, 532 (1997)).

¶ 47    To make the required showing of prejudice, Mr. Ewing contends that based on his review of the videos he believed he had a chance to beat the case because it boiled down to just his word against Mr. Flint's. He knew that Mr. Flint had credibility issues because of his two prior felony convictions and two pending felony charges. We agree with the trial court that this is insufficient to establish prejudice.

¶ 48    There is nothing in this record that establishes a reasonable probability that, had counsel reviewed the videos in color on a bigger screen or showed Mr. Ewing himself the videos on the

big screen, he would have accepted the plea offer. See *Hale*, 2013 IL 113140, ¶ 21 ("[I]n order to establish the prejudice prong of *Strickland,* a defendant must show that he would have accepted the State's plea offer had counsel's performance not been deficient.").

¶ 49 Before rejecting the plea, Mr. Ewing saw the surveillance video footage from both inside and outside the liquor store where the shooting took place. That footage showed a shooting took place outside the liquor store and also showed two men in the liquor store just before that shooting. While it is not entirely clear from this record how many or how much of the videos that are part of Exhibit 4 were shown to Mr. Ewing prior to trial, it is clear that he knew that those videos existed. His trial counsel also informed him that Mr. Flint identified him in a photograph array, and that Mr. Flint would testify and identify him at trial. Based on the evidence shared with Mr. Ewing prior to trial, the case against him for shooting Mr. Flint was strong, regardless of the quality of the videos. The enhanced quality of the videos on the larger screen did not materially change the strength of the State's case.

¶ 50 Mr. Ewing's claim that knowing the true quality of the videos would have changed his plea is further undermined by his testimony that he rejected the plea under the mistaken belief that, if he went to trial and was convicted, he would only be convicted of aggravated battery and sentenced to 15 years in prison, three years more than the plea offer. Mr. Ewing claimed at the *Krankel* hearing that his trial lawyer "assured" him that if he went to trial and lost, he would only get 15 years. His trial lawyer denied making any such guarantee as to the outcome of the trial and sentencing and the trial court found Mr. Ewing's claim that she had guaranteed such an outcome to be not credible. The trial court concluded, that it was Mr. Ewing's mistaken belief that he would only get 15 years that motivated him to reject the plea. We agree with that finding by the trial court, whether we view it as a factual finding, to be reversed only if it is against the manifest weight

of the evidence, or as a legal finding that there was no ineffective assistance, in which case we would determine it *de novo*. The record is clear that there was no showing of prejudice in this case.

¶ 51    In sum, Mr. Ewing's claim of ineffective assistance of counsel fails under the prejudice prong of the *Strickland* standard.

¶ 52                                   IV. CONCLUSION

¶ 53    For these reasons, the judgment of the trial court is affirmed.

¶ 54    Affirmed.